UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

Jane Doe, by and through her next friend C.M.;
Anna Doe, by and through her next friend C.C.;
Maria Doe, by and through her next friend S.S;
Lisa Doe

         **COMPLAINT**
         **AND JURY DEMAND**

     Plaintiffs,

- against –

RICHARD A. CARRANZA, in his official capacity
as Chancellor of the New York City Department of
Education; the NEW YORK CITY DEPARTMENT
OF EDUCATION; and the City of New York,

     Defendants.

------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1.  This lawsuit challenges the systemic and longstanding failure of the New York

City Department of Education ("NYC DOE") to protect the safety and address the needs of New

York City public school students who have been sexually assaulted or sexually harassed at their

public schools and who are consequently experiencing trauma-related disabilities.[1] By

responding to particularly vulnerable victims of sexual assault with indifference and inaction, the

NYC DOE has denied students under their protection equal access to educational opportunity,

educational resources, and special education supports that are guaranteed under Title IX of the

Educational Amendments of 1972 ("Title IX"), the Individuals with Disabilities Education Act

---

[1] As plaintiffs are survivors of gender-based violence and are minors or were minors at the time of these incidents, this Complaint refers to them as Jane Doe, Anna Doe, Maria Doe, and Lisa Doe to preserve privacy.

1

("IDEA"), 20 U.S.C. §1400 *et. seq.*; the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 *et seq.*

2.      The four Plaintiffs in this case suffered gender-based violence, sometimes repeatedly, while attending New York City public schools operated by Defendant NYC DOE. [2] Each Plaintiff has documented disabilities that impact her educational performance. All Plaintiffs were receiving specialized educational services from their respective schools when the attacks occurred.

3.      In September of 2018, when Plaintiff Jane Doe was in eighth grade at I.S. 584 in the Bronx, she was raped by a classmate in the stairwell of her school. In June 2018, when Plaintiff Anna Doe was a sixth grade student at I.S. 237 in Queens, she was raped by a classmate in a shed near school grounds while walking home from school. Plaintiff Maria Doe was a sixth grade student at Collaborative Arts Middle School in Queens in 2017-2018 when she was repeatedly taunted, punched, and sexually assaulted by multiple students at her school. Finally, in the fall of 2018, Plaintiff Lisa Doe, then a twelfth grader at Explorations Academy in the Bronx, was repeatedly groped by a classmate despite her pleas and protestations.

4.      All of these incidents of sexual assault and harassment occurred on or near school grounds when Plaintiffs were under the care of Defendants' employees. Each Plaintiff bravely reported her assault to school personnel. Some Plaintiffs made multiple reports and pleas for support. As victims of gender-based violence, Plaintiffs expected that in the aftermath of the incidents, school officials would take steps to protect their physical and emotional well-being,

---

[2] In this Complaint, the term "gender-based violence" will be used as an umbrella term meaning sexual assault and/or harassment. In common parlance, gender-based violence is a term that refers to a wide variety of harms inflicted on the basis of gender. *See* Meghan Ott, *Series: What Does That Mean? Gender-based Violence*, Women for Women International (Nov. 21, 2017), available at https://www.womenforwomen.org/blogs/series-what-does-mean-gender-based-violence.

evaluate Plaintiffs to determine their needs, and provide the academic and mental health assistance necessary for Plaintiffs to continue to receive an appropriate education.

5.      Instead, Defendants' employees ignored Plaintiffs' entreaties. School personnel declined to investigate and document the sexual assault, mocked Plaintiffs, and dismissed their claims. They failed to address Plaintiffs' safety concerns and denied Plaintiffs' requests for safety plans, refused to assist with safety transfers, and offered inadequate safety measures, if any at all. They declined to provide educational assistance and mental health support and services, giving Plaintiffs no information on how to report incidents of sexual assault and harassment, how to obtain resources to ameliorate their trauma, or how to secure the services and accommodations that they needed to maintain their education.

6.      Plaintiffs, all of whom were receiving special education services when they experienced gender-based violence, are now experiencing trauma-related disabilities as a result of the attacks. These trauma-related disabilities affect their academic performance and behavior in school. Defendants should have re-evaluated Plaintiffs to assess whether these new disabilities called for changes to their specialized educational services, and provided Plaintiffs with special education supports and services to address their trauma-related disabilities. Defendants did none of this.

7.      Defendants' failure to adequately respond to the gender-based violence and resulting trauma-related disabilities that Plaintiffs experienced stems from Defendants' inadequate personnel training on gender-based violence; Defendants' understaffing of the Title IX coordinator position; Defendants' inadequate notice to families of their rights under Title IX; Defendants' failure to employ trauma-sensitive special education evaluations and processes; and Defendants' lack of personnel training on trauma-related disabilities, their impact on education,

3

and appropriate special education services. Taken together, these shortcomings have created a system-wide culture of indifference to gender-based violence and the trauma-related disabilities it causes.

8.     Without protection or support, Plaintiffs face ongoing harassment and trauma-related mental, behavioral, and emotional health challenges that continue to take a toll on their education to this day.

9.     Plaintiffs' experiences are not isolated or unusual. They are symptomatic of Defendants' pervasive and systemic failure to take appropriate and legally mandated actions when students experience school-related gender-based violence. Moreover, Defendants routinely disregard their legally mandated obligation to evaluate students despite clear knowledge that students are presenting indications of a trauma-related disabilities.

10.     Plaintiffs should be able to rely on their schools for support and protection after they experience gender-based violence. With adequate safety measures and supports, Plaintiffs can recover from the trauma-related disabilities caused by the violence they suffered and can continue to progress in their educations. But without those supports, Plaintiffs, and other New York City students like them, will continue to be denied access to a meaningful education.

11.     Plaintiffs bring this action pursuant to Title IX; the IDEA; the Rehabilitation Act; the ADA; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, to secure for themselves and other student victims of gender-based violence the safety and services they need to support their efforts to learn and to help them heal.

4

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331.Supplemental jurisdiction over Plaintiffs' New York City law claims is proper under 28

U.S.C. § 1367.

13.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because some of

Plaintiffs' claims arose in the Eastern District of New York, Defendants administer public

schools in this District, and many of Defendants' actions and omissions complained of occurred

in this District.

## PARTIES

14.     Plaintiff Jane Doe is a fourteen-year-old girl in the eighth grade, and is currently

attending Middle School ("M.S.") 223 in the Bronx. When Jane Doe was twelve years old, and a

student in the sixth grade, she attended Intermediate School ("I.S.") 584, where she suffered

gender-based violence. That violence persisted for two years through the current school year.

Jane Doe has been diagnosed with autism spectrum disorder, Attention Deficit Hyperactivity

Disorder ("ADHD"), a learning disability, and a language disorder. Jane Doe has a classification

of Other Health Impairment on her Individualized Education Program ("IEP").

15.     Plaintiff Anna Doe is a twelve-year-old girl in the seventh grade and is currently

attending I.S. 237 in Queens. When Anna Doe was in the sixth grade at I.S. 237, she suffered

gender-based violence. This violence persisted through the start of the current school year. Anna

Doe has a classification of Intellectual Disability on her IEP.

16.     Plaintiff Maria Doe is a thirteen-year-old-girl in the seventh grade and is currently

receiving home instruction. When Maria Doe was in the sixth grade, and attending Collaborative

Arts Middle School (M.S. 355) in Queens, she suffered gender-based violence. This violence

persisted for two years through the current school year.  Maria Doe has been diagnosed with anxiety. She has a classification of Learning Disability on her IEP. She intends to return to public school next year.

17.     Plaintiff Lisa Doe is an eighteen-year-old-girl in the twelfth grade and is currently attending Harry S. Truman High School in the Bronx. When Lisa Doe began the 2018-2019 school year, and was attending Exploration Academy High School, she suffered gender-based violence. Lisa Doe has been diagnosed with anxiety and depression. Lisa Doe has a classification of Learning Disability on her IEP.

18.     NYC DOE is a department within the New York City government that manages the New York City School District, which is the largest school district in the United States and maintains its principal place of business at 52 Chambers Street, New York, NY.  NYC DOE is responsible for administering New York City's 1,840 public schools, which operate in all five boroughs of New York City and are attended by approximately 1.1 million New York City schoolchildren.

19.     Defendant NYC DOE issues regulations, called Chancellor's Regulations, pertaining to a variety of school administration and operation matters, including sexual harassment policies and the provision of special education services. All NYC DOE schools are bound by these regulations.

20.     Defendant NYC DOE receives hundreds of millions of dollars in federal funds each year, making it a program in receipt of federal funds within the meaning of Title IX, the IDEA, and the Rehabilitation Act.

21.     Defendant NYC DOE is the local educational agency within the meaning of the IDEA.

6

22.     Defendant Richard A. Carranza is the Chancellor of the NYC DOE and is responsible for its operations.

23. Defendant City of New York is a municipality within New York State and maintains the offices of its Corporation Counsel at 100 Church Street, New York.  The Chancellor of the NYC DOE is appointed by the Mayor of the City of New York.

## STATUTORY AND REGULATORY FRAMEWORK

### I.     Title IX of the Education Amendments of 1972

24.      Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681 *et seq.*

25.     Peer-to-peer sexual harassment and sexual assault that is motivated by a student's gender is considered discrimination under Title IX.[3] Under the requirements of Title IX, schools that receive federal funds have a legal obligation to protect students from such gender-based violence, including sexual assault and harassment.[4]

---

[3] Sexual harassment is defined as "unwelcome conduct of a sexual nature," U.S. Dep't of Educ., Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties, 66 Fed. Reg. 5512, (Jan. 19, 2001), available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter "2001 Guidance"].  "[S]exual harassment prohibited by Title IX can include conduct such as touching of a sexual nature; making sexual comments, jokes or gestures; writing graffiti or displaying or distributing sexually explicit drawings or, pictures, or written materials; calling students sexually charged names; spreading sexual rumors; rating students on sexual activity or performance; or circulating, showing, or creating e-mails or Web sites of a sexual nature."   U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html.

[4] *Sex-Based Harassment*, U.S. Dep't of Educ. (Sept. 25, 2018), https://www2.ed.gov/about/offices/list/ocr/frontpage/pro-students/issues/sex-issue01.html; *Sex Discrimination: Frequently Asked Questions*, U.S. Dep't of Educ. (Sept. 25, 2018), https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/sex.html.

26.     Title IX is implemented by the United States Department of Education ("US DOE"), which oversees enforcement of, and compliance with Title IX through its Office for Civil Rights ("OCR").

27.     OCR has issued a series of guidance and letters further addressing Title IX's protections against sexual harassment and bullying, including the 2001 Revised Sexual Harassment Guidance, the 2010 Dear Colleague Letter on bullying, the 2013 Dear Colleague Letter on retaliation, and the 2015 Dear Colleague Letter on Title IX Coordinators.[5]

28.     The 2001 Guidance states that schools must address student-on-student harassment if any employee knows or, in the exercise of reasonable care should have known, about the harassment.

29.     The harassment must be reported to the Title IX Coordinator, an individual tasked with responding to discrimination complaints, or an appropriate school official. The school must then conduct a prompt and thorough investigation of the incident and take appropriate steps to resolve the situation.[6]

30.     While an investigation is pending, the school must take appropriate interim measures in order to protect the safety of the student who was harassed, or, in some cases, to provide services to address the effects of harassment on the student.

---

[5] *Department of Education Issues New Interim Guidance on Campus Sexual Misconduct*, U.S. Dep't of Educ. (Sept. 22, 2017), https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct; 2001 Guidance, *supra* note 3; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Harassment and Bullying (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Retaliation (Apr. 24, 2013), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201304.html [hereinafter "2013 Guidance on Retaliation"]; U.S. Dep't of Educ. Office for Civil Rights, Dear Colleague Letter on Title IX Coordinators 3 (Apr. 24, 2015), available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf [hereinafter 2015 Guidance on Title IX Coordinators].

[6] *See* 2001 Guidance, *supra* note 3, at 13.

31.     Interim measures may include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, restrictions on contact between the parties, leaves of absence, and other similar accommodations.[7]

32.     Once a student complains, either formally or informally, to their school that a potential Title IX violation has occurred, the school may not retaliate against the student for their complaint or participation in the complaint process.[8]

33.     Federal regulations require every school district receiving federal funding to designate at least one full-time Title IX coordinator. The Coordinator is responsible for training faculty, staff, and students on rights and obligations under Title IX, and for receiving and evaluating complaints of discrimination and overseeing schools' responses to such complaints. The Title IX coordinator should not have any other job responsibilities that may create a conflict of interest.[9]

34.     The OCR has stated that "it may be a good practice" for larger school districts to designate multiple Title IX coordinators, such as one for each school or school campus.[10]

35.     Title IX requires that school districts make the role of the Title IX Coordinator(s) visible to the school community. The school district "must always notify students and employees of the name, office address, telephone number, and email address of the Title IX Coordinator."[11]

---

[7] U.S. Dep't of Educ., Office for Civil Rights, Questions and Answers on Campus Sexual Misconduct (Sept. 2017), available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

[8] 2013 Guidance on Retaliation, *supra* note 5.

[9] 2015 Guidance on Title IX Coordinators, *supra* note 5, at 3

[10] *Id.*

[11] *Id.* at 5.

36.     New York City is the largest school district in the country. One Title IX Coordinator serves the entire New York City school district of over 1,800 schools and 1.1 million students.

## II.     Individuals with Disabilities Education Act ("IDEA")

37.     The IDEA, 20 U.S.C. §1400 *et seq.*, governs how states and localities provide early intervention, special education, and related services to children with disabilities. The IDEA is designed "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs. . . ." 20 U.S.C. § 1400(d)(1)(A).

38.     The IDEA applies to children who need special education services due to a qualifying disability, disorder, or health impairment.[12]

39.     A "free and appropriate education" ("FAPE") is defined as special education and related services, provided free of charge, that meet the standards of the educational agency's general education curriculum and are in conformity with the student's individualized education program.[13]

40.     Among other things, the IDEA requires that school districts conduct a comprehensive evaluation of any student suspected to have a disability; prepare an appropriate Individualized Education Plan ("IEP") for the qualified student to ensure that he or she makes meaningful progress through the educational curriculum; re-evaluate the student if his or her

---

[12] Qualifying disabilities and disorders include intellectual disabilities; hearing, speech, language, or visual impairments; a serious emotional disturbance; learning disabilities; or other health impairments, such as autism or a traumatic brain injury.  20 U.S.C. § 1401(3)(A).  "Other health impairment" includes any impairment that causes "limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment," that "[i]s due to chronic or acute health problems," and "adversely affects the child's educational performance. . . ."  34 C.F.R. § 300.8(c)(9).

[13] *See* 20 U.S.C. §§ 1401(9).

needs have changed; and revise the IEP as appropriate. A school district's failure to provide services designed to ensure meaningful progress and/or a school district's failure to revise the IEP upon learning of a change in needs or other matters is a violation of the IDEA.

41.     An IEP is a statement of, among other things, the student's level of academic attainment, goals for the student's academic progress, the student's progress towards those goals, and the special education and related services, accommodations, and modifications that will be provided to the student.[14]  The IEP must be crafted to the student's particular needs and must ensure that the student can advance appropriately toward annual goals and progress in the general educational curriculum.[15]

42.     The IEP must be revised as appropriate to address a lack of expected progress, the student's anticipated needs, or other matters, which include anything that affects the student's emotional, behavioral, physical, or mental well-being and impacts that student's ability to make progress in school.

43.     Under the IDEA, a school district is required to ensure that a student with a disability is assessed "in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B).

44.     For the evaluation, the school district must gather all "relevant functional, developmental, and academic information, including information provided by the parent" to determine whether the child has a disability and, if so, what services and accommodations are needed to enable the child to "progress under the general educational curriculum." 20 U.S.C. § 1414(b)(2)(A).  The evaluator must use a variety of assessment tools and strategies to make the assessment and, in addition to assessing physical or developmental factors, must also assess

---

[14] *See* 20 U.S.C. §1414(d).

[15] *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

cognitive and behavioral factors and their relative contribution to the student's suspected disability.[16]

45.     Any evaluation must be comprehensive enough to identify all of the student's special education and related services needs, "whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

46.     A student with a disability must be re-evaluated if the student's educational or related services needs have changed.[17]

47.     Parents of a student with disabilities wishing to challenge the identification, evaluation, or educational placement of the student may request an administrative due process hearing before an impartial hearing officer.

48.     Although hearing officers may order the school to take specific action to comply with the IDEA, they do not have jurisdiction to order school districts to create or implement across-the-board policies or practices.

### III.     The Americans with Disabilities Act

49.     The ADA prohibits a public entity from discriminating against a person with a qualified disability and from excluding that person, on basis of his or her disability, from participating in or getting the benefits of the entity's services, programs, or activities.[18]

---

[16] *See* 20 U.S.C. § 1414(b)(2)(A)-(C).

[17] *See* 20 U.S.C. § 1414(a)(2).  Re-evaluations must comply with the requirements for evaluations enumerated in 34 C.F.R. §§ 300.304-311.

[18] *See* 42 U.S.C. § 12132.  A qualified disability is defined as "a physical or mental impairment that substantially limits one or more major life activities," or "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C.§ 12102(1).

50.     Defendants are public entities within the meaning of the ADA and are required to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 35 C.F.R. § 35.130(d).

### IV.     Section 504 of the Rehabilitation Act

51.     Section 504 of the Rehabilitation Act prohibits recipients of federal funds, including Defendants, from discriminating against individuals with qualified disabilities. *See* 29 U.S.C. § 794(a).[19]

52.     The Rehabilitation Act requires that schools "provide a free and appropriate public education" to a person with a disability. 34 C.F.R. § 104.33(a). Schools must provide education "aids and services" that are designed to meet the educational needs of students with disabilities as adequately as the needs of students without disabilities are met. *Id*. at 104.33(a)-(b).

53.     OCR guidance instructs school districts on how to evaluate and place students eligible for special education and related services under the Rehabilitation Act and the IDEA.[20]

54.     Schools must set forth the special education and/or related services that a student requires in school in a written document known as a 504 Plan.[21]

55.     When a student is suspected of needing accommodations under Section 504 but already receives services under the IDEA, the request for accommodations should be referred to the student's IEP team.[22]

---

[19] The definition of "disability" under the Rehabilitation Act is identical to that under the ADA. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12102.

[20] U.S. Dep't of Educ. Office for Civil Rights, Protecting Students with Disabilities, (Sept. 25, 2018), https://www2.ed.gov/about/offices/list/ocr/504faq.html.

[21] Chancellor's Regulation A-710.

## V.   New York Laws and Regulations

56.     The New York City Human Rights Law ("NYCHRL") prohibits sexual
harassment and discrimination, while the Dignity for All Students Act ("DASA") and the
Chancellor's Regulations impose obligations on New York City schools to respond appropriately
to a report of gender-based violence at school.

### *New York City Human Rights Law*

57.     The NYCHRL prohibits prejudice, intolerance, bigotry, discrimination, sexual
harassment and bias-related violence. N.Y.C. Admin. Law §§ 8-101 *et seq.*

58.     The NYCHRL also prohibits the denial or withholding of public facilities and
accommodations from someone on the basis of a person's disability, whether actual or perceived.
N.Y.C. Admin. Law§ 8-107(4)(a).

### *Dignity for All Students Act ("DASA")*

59.     The Dignity for All Students Act (DASA) requires every school in New York to
designate a DASA coordinator to serve as the point of contact at each school for students who
have suffered an incident of bias-based harassment, bullying, or discrimination.[23]  Acts of
harassment include those acts based on a person's actual or perceived sexual orientation, gender
or sex.[24]

60.     The designee for schools within NYC DOE is called the Respect for All Liaison
("RFA Liaison"), and is usually a teacher or administrator at the school.

---

[22] *Id.* at § V.G.

[23] N.Y. Educ. L. Art. 2 § 13.

[24] *Id.* at § 11.

61.     Among other things, DASA imposes an obligation on the school to investigate and respond to all reports of bias-based harassment, bullying, and discrimination.[25]

62.     If an incident is verified through the investigation, the school should take prompt, reasonable, and calculated action to end the offensive conduct, eliminate the hostile environment, and ensure the safety of the student who was the target of the violence.[26]

63.     In addition, each school must provide training for school employees on how to spot and respond to potential harassment, bullying, and discrimination; the effects of harassment, bullying, and discrimination on victims; and measures to prevent further incidents.[27]

64.     Finally, each school must provide annual reports to the New York State Education Department on incidents of harassment, bullying, and discrimination that occurred during the school year.[28]

### *Chancellor's Regulations*

65.     DASA is implemented in New York City schools by the Chancellor's Regulations.

66.     When a student reports an incident of student-to-student sexual harassment or sexual violence to the school, the Chancellor's Regulations require that the school promptly open an investigation into the incident and file an online report in the NYC DOE's Online Occurrence Reporting System (OORS).[29]

---

[25] *Id.* at § 13.

[26] *Id.*

[27] *Id.* at § 15.

[28] *Id.*

[29] Chancellor's Regulation A-831, § III.A.

67.     The school principal or principal's designee must immediately "inform the parents of both the alleged victim and the accused of the allegation(s)."[30]

68.     The principal or designee must conduct a full investigation and take appropriate disciplinary action in accordance with Chancellor's Regulation A-443.

69.     Within five days of receiving the complaint, the principal or their designee must interview the alleged victim, the accused student, and any witnesses and obtain written statements from each. They must also advise the accused student that if the alleged conduct occurred, it must cease immediately.[31]

70.     Within ten days, the principal or their designee must issue a written report of findings, including a determination of whether the allegations are substantiated and whether the alleged conduct constitutes a violation of the Chancellor's Regulations.[32]

71.     The principal or their designee must provide a written report of the outcome of the investigation to the victim, the parents of the accused student, and the NYC DOE.[33]

72.     Where appropriate, the victim and the accused student "should be referred to the school social worker, psychologist or other appropriate school staff, or referred to community-based agencies for counseling, support, and/or education."[34]

---

[30] *Id.* at § II. G.

[31] *Id.* at § III.B.

[32] In making such a determination, the official must take into account various factors such as the nature, severity, frequency, and scope of the behavior; whether the conduct is sexual in nature; and whether there have been other incidents involving the same students. *Id.* at § III.C.

[33] *Id.* at § III.E.

[34] *Id.* at § IV.A.

73.     In addition, the principal or designee "must follow up to ensure that the sexually harassing conduct has stopped."[35]

74.     The victim may receive a safety transfer—a transfer to a new school necessitated by safety concerns—if the parent of the student requests such a transfer and if the school determines that the student's continued presence in the school is unsafe for the student.[36]

75.     If a student was the victim of a violent criminal offense such as rape or sexual assault, the school must provide the victim with a safety transfer upon request.[37]

## STATEMENT OF FACTS

**Plaintiff Jane Doe**

76.     Jane Doe is a fourteen-year-old 8th grade student in special education currently enrolled in M.S. 223. Jane Doe identifies as Hispanic. She previously attended IS 584 for the 2016-2017 and 2017-2018 school years and until December 2 of the 2018-2019 school year.[38]

77.     Jane Doe qualifies for special education under the disability classification of other health impairment/autism. She is a qualified individual with a disability under the ADA and Section 504.

78.     Jane Doe has an IEP with a classification of Other Health Impairment. She is in a self-contained classroom made up of twelve students, one teacher, and one paraprofessional. In

---

[35] *Id.* at § IV.D.

[36] Chancellor's Regulation A-449 § III.

[37] *Id.* at § II.

[38] I.S. 584 was formerly known as J.H.S. 162. J.H.S. 162 was closed at the end of the 2016-2017 school year after repeatedly failing to meet required benchmarks. It reopened at the start of the 2017-2018 school year under its new name, I.S. 584, and under a new principal, Tannis Sertima. For simplicity, this Complaint will refer to the school as I.S. 584 for all years during which Jane Doe was in attendance, including the 2016-2017 school year. *See* Kate Taylor, *New York City to Close 'Persistently Struggling' School in the South Bronx*, N.Y. Times (Dec. 16, 2016), https://www.nytimes.com/2016/12/16/nyregion/south-bronx-jhs-162-lola-rodriguez-de-tio.html; *Opening Day for New School Year*, CSA News (Oct. 2017), https://www.csa-nyc.org/wp-content/uploads/2018/01/October-CSA-News.pdf.

addition to this 12:1:1 placement, she receives speech therapy twice per week and counseling once per week.

### *Jane Doe's Sexual Harassment in 2016-2017 and I.S. 584's Failure to Respond*

79.     During the 2016-2017 school year, Jane Doe was in 6th grade and was twelve years old. Approximately once per day during September and October of that school year, G.K., a fellow sixth grader who was fourteen years old at the time, approached Jane Doe in the school hallway and grabbed her butt.  The groping made Jane Doe feel uncomfortable and upset.

80.     In October 2016, Jane Doe's mother grew frustrated with the ongoing harassment and filed a complaint about G.K.'s behavior with the New York City Police Department by making a report to an officer in the 40th precinct.

81.     Jane Doe's mother also filed a complaint about G.K.'s behavior with Principal Deborah Sanabria of I.S. 584.

82.     Principal Sanabria verbally informed Jane Doe's mother that she suspended G.K. and another male student in connection with the incident, and that G.K. and the other student would no longer bother Jane Doe.

83.     I.S. 584 took no action to investigate this incident or to protect Jane Doe.

84.     Jane Doe's mother never received information on how to file a Title IX complaint from a school mailing or any other notification. Upon information and belief, I.S. 584 also did not provide information or trainings for students or parents on bullying and sexual harassment. Jane Doe never observed notices or posters about sexual harassment at I.S. 584, did not receive training from I.S. 584 about how to recognize or respond to sexual harassment, and was never told that she could or should approach a particular I.S. 584 staff member for assistance if she

witnessed or experienced sexual harassment. In addition, I.S. 584 does not have a website where Title IX information can be shared with students and families.

85.     In January 2017, G.K. again began to grab Jane Doe's butt when he encountered her in the school hallway. This behavior continued unabated through the end of the school year.

86.     Shortly thereafter, Jane Doe's mother filed a second complaint with Assistant Principal Terrell about the renewed harassment.

87.     I.S. 584 did not conduct an investigation and did not provide Jane Doe's mother with a copy of her report.

88.     Early in the spring of 2017, G.K. demanded that Jane Doe kiss him, and she refused. He tried a second time to kiss her and she refused again.

89.     During the 2017-2018 school year, a new principal was assigned to the school, Principal Tannis Sertima.

### *Jane Doe's Sexual Harassment and Rape in September 2018 and I.S. 584's Failure to Respond*

90.     Beginning on the first day of the 2018-2019 school year, G.K. began to repeat the unwelcome advances towards Jane Doe by grabbing her butt when he saw her in the hallway.

91.     During the first week of school in September, Jane Doe went outside during her "extended day" free period at the end of the school day. As dismissal was beginning, G.K. approached Jane Doe as she walked back into the school building with her friend, A.S. G.K. followed Jane Doe into a stairwell and said he wanted to talk to her. A.S. continued walking and exited the stairwell, leaving Jane Doe and G.K. alone. G.K. then forcibly removed Jane Doe's clothing and forced his penis inside her vagina. Jane Doe repeatedly cried out "No!" but G.K. did not stop.  He then left Jane Doe alone in the stairwell.

92.     Jane Doe was extremely upset about the incident and did not disclose it to her mother.

93.     The following morning, Jane Doe went to the school's main office. She approached a short, middle-aged Caucasian woman with blonde hair who was standing behind the desk and asked to make a complaint about G.K. The woman gave Jane Doe a complaint form and Jane Doe wrote a statement about the rape. Jane Doe then handed the report back to the woman and left the main office to go to class.

94.     As Jane Doe was heading to class, she saw Principal Sertima, who asked Jane Doe why she was in the hallway. Jane Doe told her that she had just finished filing a complaint about G.K. She then told Principal Sertima that G.K. had raped her the day before.  Principal Sertima replied that she felt sorry for Jane Doe.

95.     Although Jane Doe promptly reported her rape to two school personnel, school officials at I.S. 584 again took no action to investigate the rape or to protect Jane Doe.

### *I.S. 584's Improper Response to Jane Doe's Sexual Harassment*

96.     In subsequent days, G.K. began to tell other students at I.S. 584 that Jane Doe had let him put his penis inside of her. One of G.K.'s friends approached Jane Doe and mockingly asked her if G.K. was telling the truth. Another student called Jane Doe a "ho."

97.     Jane Doe was traumatized by the rape and ensuing harassment. She often felt humiliated and angry while at school. She got frustrated at school and felt fearful knowing that G.K. was in the same building.

98.     Because of the rape, the ensuing harassment, and the after-effects of both, and because she received no support from school officials, Jane Doe began to struggle to complete school work and participate in class.

99.    In mid-September, Jane Doe's mother, who had not yet learned that Jane Doe had

been raped, learned from a third party that G.K. had been groping Jane Doe again.  Jane Doe's

mother reported the groping to I.S. 584 on September 17, 2018.

100.    In response to the report, Principal Sertima met with Jane Doe's mother on

September 21, 2018. Principal Sertima discussed the groping with Jane Doe's mother, but did

not tell her that Jane Doe had reported being raped or that Jane Doe had filed a written complaint

about the rape.

101.    Principal Sertima also prepared an OORS report on September 21, 2018. The

report stated that G.K. was groping Jane Doe, that Principal Sertima concluded her investigation

on September 20, 2018, and that she had met with Jane Doe's mother on September 21, 2018.

The report made no mention of the rape that Jane Doe had reported to Principal Sertima

approximately two weeks prior.

102.    The OORS report stated that I.S. 584 advised Jane Doe to report "any issues or

concerns that make her feel uncomfortable," that "[a]ll students must keep their hands to

themselves," and that she and G.K. should "stay away from each other at all times."

103.    The staff failed to provide Jane Doe's mother with information about her right to

file a Title IX claim. The OORS report was not provided to Jane Doe's family until months later.

104.    Yet again, I.S. 584 took no action to protect Jane Doe. Instead, I.S. 584 placed the

burden on Jane Doe to protect herself from future harm.

### *I.S. 584's Continued Failure to Respond to Additional Reports of Jane Doe's Rape*

105.    Approximately three weeks after the rape, Jane Doe told a *third* school employee,

her guidance counselor, Ms. Beasley, about the rape.  Ms. Beasley instructed Jane Doe not to pay

attention to G.K., to stay away from him during lunch period, and to avoid looking at or making eye contact with him.

106.    Ms. Beasley also told Jane Doe not to tell any other students about the rape.

107.    Instead of reporting Jane Doe's rape to school authorities, Ms. Beasley told Jane Doe to make a complaint to the school. When Jane Doe replied that she had already made a complaint, Ms. Beasley did not ask when she filed it.

108.    Despite having yet another opportunity to address Jane Doe's report, I.S. 584 took no action to investigate the rape or to protect Jane Doe.

109.    On October 19, 2018, Jane Doe told her mother that G.K. had raped her at school.

110.    On October 22, 2018, Jane Doe's mother went to I.S. 584 with her sister-in-law, M.M., to report the rape to school staff.

111.    Jane Doe's mother spoke with Principal Sertima and Ms. Beasley, neither of whom disclosed that Jane Doe had previously reported the rape to them.

112.    Principal Sertima asked Jane Doe's mother if Jane Doe had reported the rape to school staff or filed a complaint. Jane Doe's mother informed Principal Sertima that Jane Doe had done both of those things.

113.    Principal Sertima told Jane Doe's mother that the school would investigate the incident, but could do nothing until the investigation was complete.

114.     Jane Doe's mother asked that G.K. be kept away from Jane Doe, but Ms. Beasley responded that it would be too difficult to keep Jane Doe and G.K. separate because they shared a lunch period.

115.    While in the office, M.M. overheard Principal Sertima say to a staff member that she did not want to be involved in the investigation, that she did not "have time for all this drama," that Jane Doe is a problem child, and that Jane Doe's mother is a problem parent.

116.    Neither Jane Doe nor her mother heard back from school officials after the October 22, 2018 meeting.

117.    Contrary to what Principal Sertima told Jane Doe's mother, I.S. 594 did not open an investigation into Jane Doe's rape. In fact, I.S. 584 took no action to investigate this incident or to protect Jane Doe after this meeting.

118.    After the rape and continuing through the end of November 2018, Jane Doe saw G.K. every day during their shared lunch period. G.K. frequently approached Jane Doe's lunch table and stared at Jane Doe angrily while speaking to other students at her table. Jane Doe would try to look elsewhere but when she looked back, G.K. would still be staring at her. This made Jane Doe uncomfortable and fearful.

119.    School staff were present during each of these interactions but did not intervene.

120.    In November, Jane Doe's mother approached Assistant Principal Terrell at school, informed him that Jane Doe was frightened and uncomfortable when she saw G.K. at school, and asked what the school would do to keep G.K. away from Jane Doe. Assistant Principal Terrell told Jane Doe's mother that the school could do nothing to stop G.K. from approaching Jane Doe at school.

121.    School officials at I.S. 584 did not provide Jane Doe's mother with any suggestions or support to help Jane Doe cope with the after-effects of the rape and ensuing harassment. When Jane Doe, by and through counsel, sought Principal Sertima's support in

securing a safety transfer, Principal Sertima refused, stating that "principals don't help with safety transfers."

122.    By and through counsel, Jane Doe contacted the Superintendent to request a safety transfer on November 29, 2018. On December 3, 2018, Jane Doe began school at M.S. 223.

123.    On February 4, 2019, after repeated requests for documentation by and through Jane Doe's counsel, Mildred Colon, the Pupil Accounting Secretary at I.S. 584 confirmed that no occurrence reports, complaints, or witness statements were on file at I.S. 584 regarding Jane Doe's rape.

124.    According to Ms. Colon, I.S. 584 personnel had reviewed occurrence reports for "all the incidents we were made aware of" regarding Jane Doe and found no documentation of Jane Doe's rape.

### Decline in Jane Doe's Mental Health Following the Rape and Impact on Her Education

125.    Since the onset of Jane Doe's harassment in 2016, she has shown signs of anxiety, stress, and depression, all of which have impacted her performance in school. These issues became more significant when G.K. raped Jane Doe.

126.    Jane Doe has difficulty focusing on her classwork, struggles with her memory, and does not remember what she learned after each school day.

127.    Jane Doe showed even more pronounced symptoms of trauma after she was raped. Jane Doe has required more redirection to help address her distraction in the classroom, and she has often had to ask her teachers for additional time to complete assignments and tests.

128.    As a result, Jane Doe has had noticeable difficulty meeting her academic goals. According to her most recent IEP, she did not reach her writing and reading goals from the prior

year's IEP. Her IEP team failed to discuss or note whether she had made progress in speech and math from the prior year.

129.     Whereas Jane Doe's prior IEPs indicated that she was a motivated student and that her progress was steady, her most recent IEP notes that she needs a "lot of repetition" in order to understand the standards discussed in class.

130.     Jane Doe's teachers at M.S. 223 report that Jane Doe often sleeps in class. On two occasions, Jane Doe's teacher called Jane Doe's mother to report that she was crying in class.

### M.S. 223's Inadequate IEP Assessment of Jane Doe and Refusal to Re-Evaluate Jane Doe in December 2018

131.     On December 12, 2018, the IEP team convened to conduct its annual review of Jane Doe's IEP.

132.     Jane Doe's updated IEP does not mention the rape or any assault or harassment that Jane Doe has experienced, nor does it include any services to address changes in Jane Doe's behavioral and emotional health that have occurred as a result of the rape and harassment. Jane Doe's IEP simply adopted the same services as the previous year with no consideration to the changes that the school staff had noticed in her academic performance.

133.     Jane Doe's mother discussed the rape with Ms. Myers, a staff member responsible for the provision of special education at M.S. 223, during a parent-teacher conference following Jane Doe's IEP meeting.

134.     Ms. Myers told Jane Doe's mother that M.S. 223 would help Jane Doe cope with the rape. However, Ms. Myers said that they could not discuss the rape in Jane Doe's IEP unless the IEP team had written proof that the rape had occurred.

135.     Even though Jane Doe's mother had informed Ms. Myers of Jane Doe's rape, Ms. Myers did not reopen Jane Doe's IEP nor did she inform Jane Doe's mother that she could

request that Jane Doe be re-evaluated for new disabilities and that her special education services be changed in response to the rape.

### *Lasting Effects of the Rape on Jane Doe*

136.     Jane Doe's rape continues to impact her academic performance and functioning. She reports having difficulty with memorization and concentration approximately four to five times a day. Jane Doe finds herself thinking about the rape every day. When this occurs, she becomes distracted during class and daydreams, unable to focus on what her teachers and peers are saying. During classroom instruction, Jane Doe asks for breaks to cope with feeling upset and angry as a result of the rape. She must ask for breaks multiple times a week.

137.     Jane Doe's mother reports that Jane Doe's math grades are declining and that it takes her longer to complete assignments.

138.     G.K.'s friend attends M.S. 223 with Jane Doe. Upon information and belief, G.K. told this friend that he raped Jane Doe. This friend has since told several of Jane Doe's classmates about the incident. Jane Doe's friend recently told her that "the whole school knows" that she was raped at her old school. These comments make Jane Doe feel uncomfortable and very sad while she is at school, and they make it difficult for her to focus when she is in class.

139.     Jane Doe continues to experience emotional crises and humiliation, even at her new school, as a result of the rape and harassment she has been forced to endure.

140.     Jane Doe estimates that the rape she experienced and its impact on her mental and emotional health have caused her to miss three full days of school, leave early on five days, and arrive late on four days.

141.     Jane Doe is currently seeking mental health treatment to help her cope with the emotional impact of the gender-based violence she experienced and her school's response to it.

26

She has trouble sleeping and has nightmares about the rape almost every night. Jane Doe takes Tylenol PM to address this issue. As a result, Jane Doe and her family have incurred costs related to this treatment including, but not limited to, costs from purchase of medication and transportation to and from appointments.

142.    Jane Doe informed school officials at I.S. 584 that G.K. was sexually harassing her long before he raped her. School personnel failed to take any steps to curb the harassment, including a timely investigation of the incident, the provision of a written report of investigative findings, or other actions mandated by the Chancellor's Regulations and Title IX. Moreover, school personnel failed to take affirmative steps to address or intervene in G.K.'s conduct when they became aware of the sexual harassment and failed to advise Jane Doe of her rights under Title IX.

143.    Because the school failed to intervene, G.K. continued to harass Jane Doe unabated and, ultimately, raped her in a school stairwell. Jane Doe dutifully informed her principal and guidance counselor of the rape and provided a written statement. When the school took no action, she informed her mother, who made an additional report to the school. Despite repeated reports of the harassment and rape, school personnel, who possessed the authority to take immediate and corrective measures, did not conduct an investigation, provide a written report, implement either interim or long-term safety measures, or provide support address the effects of the harassment and rape.  They also failed to advise Jane Doe of her rights under Title IX.

144.    I.S. 584 was aware that Jane Doe had been raped and that, as a result of the rape and harassment, Jane Doe was experiencing mental, behavioral, and emotional health changes

that were interfering with her education.  Despite that knowledge, the school did not assess whether these changes warranted a re-evaluation of Jane Doe's current IEP.

145.    This failure is part of Defendants' pattern and practice of failing to conduct special education re-evaluations of students with special education services who are exhibiting trauma-related mental, behavioral, and emotional health challenges as a direct result of gender-based violence.

146.    As a result of Defendants' acts and omissions, Jane Doe has been denied the ability to meaningfully access her education under Title IX, has been deprived of the ability to make meaningful progress under the IDEA, and has been deprived of reasonable accommodations under the ADA and Section 504 of the Rehabilitation Act.

**Plaintiff Anna Doe**

147.    Anna Doe is an eleven-year old 7th grade student who is currently attending I.S. 237 in Queens. Anna Doe identifies as Asian. She began attending I.S. 237 during the 2017-2018 school year.

148.    Anna Doe qualifies for special education under the disability classification of intellectual disability. Anna Doe is a qualified individual with a disability under the ADA and Section 504. She has an IEP with a classification of Intellectual Disability. She is in a self-contained classroom made up of twelve students, one teacher, and one paraprofessional. In addition to this 12:1:1 placement, she receives speech therapy three times per week and counseling once per week.

28

*Anna Doe's Rape in June 2018*

149.     On June 5, 2018, Anna Doe was on her way home from school when she saw

John Doe, a male student that she recognized from her after-school program.[39] Anna Doe does

not know John Doe's name.

150.     John Doe invited her to get a snack at the local store and then to a shed located

one block away from the store. In the shed, he pulled her pants and underwear down and

vaginally penetrated her with something she described as hard and painful. John Doe then left the

shed and Anna Doe went home, where she told her mother what John Doe had done.

151.     The next day, on June 6, 2018, Anna Doe's mother went to the school to report

that Anna Doe had been raped by another student. The school official told her to report it to the

police at the 109th precinct.

152.     Anna Doe's mother immediately went to the 109th precinct, where a police officer

told her that it was the school's responsibility to respond to her complaint and notify the police.

Anna Doe's mother went back to the school the same day to report the incident for a second

time.

***I.S. 237's Failure to Adequately Respond to the Report of Anna Doe's Rape***

153.     I.S. 237's Principal Judith Friedman and Assistant Principal Carla Barthwaite met

with Anna Doe' mother on June 11, 2008.  Anna Doe's mother is Limited English Proficient,

and her native language is Mandarin. She was concerned that she would have a difficult time

---

[39] Anna Doe never learned the name of her assailant. The student attends the same after school program that she does and she can identify him on sight. Despite the fact that the school and other investigating authorities identified the student, they did not share his identity with Anna Doe or her mother. To this day, neither Anna nor her mother know the name of the student who raped her.

communicating her concerns and questions to school officials, so she brought a friend with her to the meeting.

154.    At the meeting, Principal Friedman and Assistant Principal Brathwaite, questioned Anna Doe's motives for being with John Doe that day, implying that she was partly to blame for the rape. Among other things, they asked school was why Anna Doe was hungry, why she had willingly gone with John Doe to get snacks, and why she had gone with John Doe to the shed.

155.    When Anna Doe's mother expressed concern about her daughter attending school with John Doe, Principal Friedman and Assistant Principal Brathwaite said that the school could not guarantee that Anna Doe and John Doe would not cross paths in the hallway.

156.    School personnel took inadequate steps to investigate the incident and took no action to protect Jane Doe.

157.    I.S. 237 does not provide clear access to Title IX resources and obligations to parents or students through their website. The school's homepage contains no links to its Title IX or anti-discrimination policies.[40]

158.    Upon information and belief, I.S. 237 does not require students to attend an informational session on bullying or sexual harassment where they are informed of the school's policies on bullying or sexual harassment, how to report incidents, and the resources available to students who have been bullied or sexually harassed.

---

[40] Rachel Carson Intermediate School 237Q, https://rcis237.org/ (last visited April 18, 2019.)

*Impact of the Rape on Anna Doe's Mental Health and Educational Progress*

159.    The after-effects of the rape impacted Anna Doe's performance in school. Anna Doe had trouble sleeping, stayed in bed more than usual, and experienced symptoms of depression.

160.    Anna Doe also struggled emotionally. Her teachers characterized her as a sensitive girl who was easily upset and often misread social cues, frequently assuming that a person was angry with her. She had difficulty explaining when something was upsetting her and demonstrated increased difficulty in adjusting to new situations.

161.    The impact on Anna Doe's mental and emotional well-being impedes her ability to make educational progress. As a result of her depression and difficulties with sleep, Anna Doe is often tired in school. Anna Doe's 2018-2019 IEP indicates that she failed to meet her speech goal of sequencing a story to retell the events chronologically, failed to meet her science goal of forming a hypothesis, failed to meet the goal of making inferences in social studies documents, and made minimal progress in her math goal of adding and subtracting numbers.

162.    I.S. 237 was aware that Anna Doe had been raped and that, beginning after the rape and as a result of the rape, Anna Doe was experiencing mental, behavioral, and emotional health challenges that were interfering with her education.

163.    Following the assault, school staff had assured Anna Doe's mother that since John Doe was not in the same class as Anna Doe, there would be minimal contact between them. No other steps were taken to ensure her safety. Yet, in September 2018, at the start of the new school year, Anna Doe was placed in a speech therapy class with John Doe.

164.    On or about September 20, 2018, John Doe approached Anna Doe during the class, touched her stomach and tried to tickle her.

165.    A paraprofessional in the class who witnessed the interaction knew that John Doe was the same student who had raped Anna Doe and notified the principal. That day, Anna Doe told her mother that the "same boy" had touched her around her belly during class and that she had felt his hands on her body.

166.    The school later called Anna Doe's mother, told her that it was a mistake that Anna Doe and John Doe had been put in the same class, and said that they would no longer be in the same speech class.

167.    Anna's mother again reiterated her request for a safety plan at I.S. 237 to minimize contact between Anna Doe and John Doe. To date, the school has not created a safety plan.

168.    School officials took no further action in response to this subsequent contact by John Doe. Despite the fact that Anna Doe had reported her rape the previous year, when school officials at I.S. 237 learned that John Doe had again assaulted Anna Doe, they again took no action to investigate this incident or to protect Anna Doe.

169.    John Doe continues to attend the same school as Anna Doe, and she still sees him.

### I.S. 237's Inadequate IEP Assessment of Anna Doe in November 2018

170.    On November 27, 2018, Anna Doe's school held the annual IEP meeting. The IEP team had access to Anna Doe's student records and was, therefore, aware of the rape and subsequent assault. The IEP team was also aware of Anna Doe' struggle to make progress in her IEP due to the trauma she experienced from being raped.

171.    During this meeting, school staff did not discuss the rape, the subsequent contact between Anna Doe and John Doe, or the impact of the trauma on Anna Doe's academic or emotional well-being. When counsel, who attended the IEP meeting, asked how the rape had

32

affected Anna, the IEP team dismissed the question. IEP team members said that the incident had been handled and that there had been no consequences for Anna's education.

172.    This failure is part of Defendants' pattern and practice of failing to conduct special education re-evaluations of children who are exhibiting trauma-related mental, behavioral, and emotional health challenges as a direct result of gender-based violence.

### *Lasting Effects of the Rape on Anna Doe*

173.    Anna Doe's rape continues to impact her academic performance and functioning.

174.    Anna Doe continues to have difficulty paying attention in class. She frequently shuts down in class because she misinterprets her teachers' social cues and body language, convinced that they are upset with her.

175.    Anna Doe also continues to struggle in managing her emotions in relation to other peers in her class. There is another male student in Anna Doe's class who frequently stares at her and on occasion has lifted his shirt and exposed his stomach to her. Each time this happens, Anna Doe gets upset, cries, or shuts down.

176.    Defendants did not offer to evaluate Anna Doe for new disabilities after her rape despite indications that she had failed to make meaningful progress.

177.    Anna Doe repeatedly expressed concern that others will think John Doe's actions are her fault or that she did something wrong. She regularly repeats the phrase "it's not my fault" and asks if she is in trouble.

178.    The trauma of the sexual assault has severely impacted Anna Doe's mental and emotional health and has caused her to miss approximately four to five days of school. Anna Doe likely would have missed more days of school had the school year not ended within three weeks of the rape.

179.    Anna Doe sought mental health treatment for three months following the rape to help her cope with the emotional impact of the gender-based violence she experienced and her school's response to it.

180.    Anna Doe continues to receive counseling in school. Anna Doe's mother recently decided that she would pursue additional outside mental health treatment to help address Anna Doe's emotional needs in school.

181.    Anna Doe's mother cumulatively missed nearly a week of work because she had to travel with Anna Doe to attend these sessions. Anna Doe and her family have incurred costs related to Anna Doe's treatment, including but not limited to transportation to and from appointments and missed work.

182.    Anna Doe's mother reported the rape to Principal Friedman and her mother was in frequent contact with the school in the aftermath of the rape. Yet, the principal, who possessed authority to take immediate and corrective measures, took no steps create a safety plan for Anna Doe after the rape. As a result of the school officials' failure to intervene, John Doe sexually harassed Anna Doe a few months later by approaching her and touching her inappropriately. Despite knowledge of these incidents, school personnel, who possessed the authority to take immediate and corrective measures, failed to advise Anna Doe of her rights under Title IX, conduct an investigation, provide a written report, implement either interim or long-term safety measures, or provide support address the effects of the harassment and rape.

183.    As a result of Defendants' acts and omissions, Anna Doe has been denied the ability to meaningfully access her education under Title IX, has been deprived of the ability to make meaningful progress under the IDEA, and has been deprived of reasonable accommodations under the ADA and Section 504 of the Rehabilitation Act.

**Plaintiff Maria Doe**

184.    Maria Doe is a thirteen-year-old student 7th grade student currently receiving home instruction in Queens. Maria Doe identifies as Black. She previously attended Collaborative Arts Middle School in Queens for the 2017-2018 school year and through February of the 2018-2019 school year.

185.    Maria Doe qualifies for special education under the disability classification of learning disabled. Maria Doe is a qualified individual with a disability under Section 504 and the ADA. She has an IEP with a classification of Learning Disability. She was previously placed in an integrated co-teaching classroom but, as of the 2018-2019 school year, her services consisted solely of Special Education Teacher Support Services ("SETTS") three times a week. Since being home schooled, she is not receiving any special education services.

***Maria Doe's Sexual Harassment at Collaborative Arts and Collaborative Arts'
Inadequate Response***

186.    On the first day of the 2017-2018 school year, when Maria Doe was starting the 6th grade, a girl that Maria Doe did not know came up to her in the hallway and called her a "THOT," an acronym for "that ho over there."

187.    Maria Doe did not have any further interaction with this girl. However, shortly thereafter a group of boys in her class began a campaign of harassment against her that lasted throughout the school year

188.    These boys, S.J., M.S., O.J., and H.T., regularly came up to Maria Doe, taunted and insulted her by saying she sounded like a man, looked like a man, that her voice was deep, and that she must be transgender. They made references to her body, saying she was masculine in appearance.

189.    On several occasions, this group of boys came up behind her during lunch and repeatedly punched her in the arm and back.

190.    Friends of S.J., M.S., O.J., and H.T. also posted pictures of Maria Doe on social media and calling her a THOT.

191.    Maria Doe regularly reported these incidents to Lamont O'Neil, one of the deans in her school. She expressed a desire to change her class to avoid these repeated incidents. Dean O'Neil told her that her class could not be changed.

192.    Collaborative Arts took no action to investigate this incident or to protect Maria Doe.

193.    Upon information and belief, Collaborative Arts did provide students with instructions on what to do if they were bullied, sexually harassed, or sexually assaulted. Maria Doe was never told by anyone at Collaborative Arts that she could or should tell a school employee of bullying or sexual harassment.

194.    Maria Doe has never observed any notices posted at the school informing students about the school's policies on bullying or sexual harassment or procedures for reporting such behavior.  The school's homepage contains no links to its anti-discrimination and anti-harassment policies or to Title IX.[41]

195.    Upon knowledge and belief, Collaborative Arts does not require students to attend an informational session on bullying or sexual harassment where they are informed of the school's policies on bullying or sexual harassment, how to report incidents, and the resources available to students who have been bullied or sexually harassed

---

[41] MS355 Collaborative Arts Middle School, http://www.camsq355.org/ (last visited April 18, 2019)

***Maria Doe's Sexual Assaults in Spring 2018 and Collaborative Arts' Failure to Respond***

196.     During the spring semester of the 2017-2018 school year, D.Y., another male student, approached Maria Doe while she was standing in front of the school. He gave Maria Doe a hug and stuck his fingers through her skirt in an attempt to penetrate her vagina. Maria Doe pushed him away.

197.     Maria Doe promptly reported the incident to Malik James, a teacher and Assistant Dean at the school. Mr. James dismissed the actions of D.Y. by saying "oh, he just likes you."

198.     D.Y. sexually assaulted Maria Doe twice more in the spring of 2018 before the school year ended   He approached Maria Doe, once in a staircase inside the school, and once outside the school building. Each time, D.M. hugged her, and tried to penetrate her vagina with his fingers. She reported each incident to school staff, but none of them took her accounts seriously or took any action to curb D.Y.'s behavior. The behavior only ceased because D.Y. graduated at the end of the school year.

199.     Once again, Collaborative Arts took no action to investigate this incident or to protect Maria Doe.

***Impact of the 2017-2018 Harassment and Sexual Assault on Maria Doe***

200.     The cumulative effect of these incidents had a significant impact on Maria Doe. She began experiencing anxiety and depression, and she lay awake at night wondering what would happen to her at school the next day.

201.     Maria Doe began cutting herself on her arm and thigh because she felt that her complaints about the harassment were falling on deaf ears.

202.    Maria Doe had previously performed well in school but, as a result of the harassment, she found it hard to focus in class and her academic performance began to suffer. She was no longer excited about school and dreaded going on a daily basis.

203.    Throughout the 2017-2018 school year, Collaborative Arts personnel noticed that Maria Doe was frequently distracted, off-task more often in the classroom, and would shut down or struggle when trying to complete assignments.

204.    Maria Doe failed to make meaningful progress as a result of her mental and emotional trauma. Her instructional levels remained at a fifth grade reading level and a third grade math level.

205.    During the 2017-2018 school year, Maria Doe also struggled socially. Her 2017-2018 IEP indicated that she had poor relationships with classmates and her teachers reported that she was often combative and hostile toward her peers.

206.    Defendants were aware that Maria Doe had been repeatedly harassed and that Maria Doe experienced mental, behavioral, and emotional health changes that were interfering with her education. In addition, Defendants were aware that these changes began after Maria Doe's first reports of harassment and worsened as the harassment continued.

### *Maria Doe's Continued Harassment in 2018 and Collaborative Arts' Continued Failure to Respond*

207.    Maria Doe's harassment resumed when classes resumed in the fall of 2018.    She was harassed by J.T., one of the boys who had harassed her last year, and B.S., a friend of J.T.'s.

208.    J.T., regularly approached Maria Doe in the hallway and cafeteria and insulted her just as he had the year before, calling her a man, or a boy, or saying she looked transgender. Sometimes, he would call her a "ho." Other times he would hit her and run away.

38

209.     Maria Doe reported this behavior to Dean O'Neil as well as to Ms. Hanna, the guidance counselor, but they told Maria Doe that she was overreacting and took no further steps to abate the harassment.

210.     On October 10, 2018, J.T. approached Maria Doe in the cafeteria and, when she asked him to stop calling her a man, he refused and proceeded to laugh at her. The situation escalated and J.T. punched Maria Doe in the left eye. Maria Doe sought medical attention for the injury.

211.     Maria Doe reported this harassment and assault, and yet again school officials at Collaborative Arts failed to conduct an investigation, failed to provide a written report to the family, failed to implement either interim safety measures or a long-term safety plan to protect Maria Doe, failed to provide suggestions or support to Maria Doe to deal with the after effects of the harassment.

212.     Shortly after the October 10 incident, B.S., a friend of J.T., began approaching Maria Doe in the cafeteria and putting his arm around her. He would yell insults at her in the hallway and frequently laugh and point at her with his friends.

213.     On November 21, 2018, B.S. approached Maria Doe in the hallway, wrapped his arm around her, pressed his penis against her butt, and touched her breast. She yelled that he needed to get away from her. Another school official, Dean Scott, was present in the hallway at the time of this incident. Maria Doe reported the incident to Dean O'Neil that same day.

214.     Later that evening, Maria Doe received a series of text messages from B.S. When she asked that he leave her alone, he told her that he planned to touch her again.

215.     At school the next day, Maria Doe showed these text messages to Dean O'Neil and Ms. Hannah. They dismissed her complaints failed to take any action in response.

216.    On November 22, at lunch, B.S. approached Maria Doe, wrapped his arm around her and touched her breast again.

217.    Maria Doe got up from the table and went upstairs to class. B.S. followed her and grabbed her by the shoulder. She elbowed him and told him to get away from her, at which point a teacher saw the interaction and told B.S. to leave Maria Doe alone. Maria Doe immediately reported the behavior to Dean O'Neil. The dean told Maria Doe that B.S. was a "touchy-feely kind of person" and that he was "touching her because he liked her."

***Retaliation Against Maria Doe***

218.    Shortly thereafter, school officials at Collaborative Academy facilitated a mediation that included Dean O'Neil and several other female students who had reported similar experiences of B.S. inappropriate behavior.

219.    Maria Doe and her mother did not receive any information about this mediation, nor were they given the opportunity to attend.

220.    Sometime toward the end of November, Ms. Hannah saw the cuts on Maria Doe arm. She told Maria Doe's mother what she had seen and expressed concern that Maria Doe was self-harming.

221.    Following the incident on November 22, school officials at Collaborative Arts called the parents of Maria Doe and B.S. for a meeting. The meeting occurred on December 7, 2018.

222.    During this meeting, Maria Doe became upset when B.S. failed to show any remorse or concern about the incidents between them. In response to Maria Doe's emotional response, Dean O'Neill ended the meeting and everyone began to leave.

223.    As Maria Doe left the room, B.S. attempted to touch her and, fearful that he would grope her again, Maria Doe moved towards B.S. in an attempt to stop him. Before anything could happen, Dean O'Neil stepped between the two students and pressed Marie Doe against the wall. He then then escorted Maria Doe and her mother out of the building.

224.    Distressed that school officials had failed once again to take any action to prevent B.S. from further harassing Maria Doe, she and her mother went to their car and called the 105th Police Precinct to report the harassment. The police officer told them that it was a matter for school safety to address and that there was nothing that they could do about it.

225.    Maria Doe, angry and upset that her repeated complaints had done nothing to abate the harassment, got out of the car, and went back inside the school where she saw B.S. exiting the office. In her frustration over the situation, Maria Doe picked up a small plastic box that was in the hallway and threw it in B.S.'s direction.

226.    In response to Maria Doe's action, school officials sought a superintendent suspension.

227.    Upon information and belief, B.S. was not disciplined for attempting to touch Maria Doe at the December 7th meeting or for any of his prior harassment of Maria Doe.

228.    In the online occurrence report, report, Dean O'Neil noted that the actions for which Maria Doe was being suspended occurred after a meeting concerning an incident of inappropriate touching.

229.    Maria Doe was suspended for the incident on December 20, 2018 and transferred to another school.

230.    Upon information and belief, B.S. was not disciplined for attempting to touch Maria Doe during the December 7 meeting or for any of his prior harassment of Maria Doe.

231.    Defendants, by and through their suspension of Maria Doe, retaliated against Maria Doe for reporting the sexual assaults that she experienced.

232.    A suspension hearing was held on January 10, 2019,

233.    During the hearing, Dean O'Neil confirmed that Maria Doe had made multiple reports to school officials about being harassed by B.S.  He stated that the counselor and the principal were both aware of the ongoing harassment.

234.    Maria Doe testified that she threw the plastic box at B.S. because she was frustrated at the school's continued indifference towards her complaints and upset that the harassment would likely continue.

235.    James Coughlin, the suspension hearing officer presiding over the suspension hearing, issued a decision in which he failed to consider the sexual harassment that Maria Doe experienced and its connection to the altercation. The suspension was sustained.

***Collaborative Arts' Inadequate Assessment of Maria Doe's IEP in December 2018***

236.    On December 12, 2018, just days after the meeting between Maria Doe and B.S., Maria Doe's IEP team convened to conduct its annual review of Maria Doe's IEP. Maria Doe's mother participated in the meeting by telephone.

237.    The IEP team had access to Maria Doe's student records and was, therefore, aware of the ongoing harassment.

238.    During the meeting, Maria Doe's mother raised her concerns about the impact of the harassment on Maria Doe's academic performance. She mentioned how Maria Doe was falling behind with school work, how she was struggling emotionally as a result of the harassment, and how she was having a difficult time being in school on a daily basis.

239.    IEP team members told Maria Doe's mother that they would not discuss the harassment at the meeting and would only talk about the IEP itself. The IEP team did not discuss the impact of the harassment on Maria Doe's academic progress. The IEP team did not re-evaluate Maria Doe's IEP despite the concerns raised by Maria Doe's mother and despite their knowledge that Maria Doe was struggling in class.

240.    Maria Doe's 2018-2019 IEP notes that she did not meet her math goal of learning to use multiplication and division. The IEP fails to mention whether Maria Doe had accomplished her goals from previous years and fails to establish goals for the coming year.

241.    Maria Doe's updated IEP does not mention the harassment, nor does it include services to address changes in her behavioral and emotional health as a result of the harassment. The IEP simply adopts her prior services without considering changes in circumstance.

242.    This is part of Defendants' pattern and practice of failing to conduct special education re-evaluations of children who are exhibiting trauma-related mental, behavioral, and emotional health challenges as a direct result of gender-based violence.

### *Maria Doe's Transfer out of Collaborative Arts*

243.    Prior to the sexual harassment, Maria Doe enjoyed school and was making academic progress. As a result of the harassment and the suspension that followed, Maria Doe began suffering from anxiety and depression.

244.    Maria Doe found it more challenging to concentrate in class, as she spent most of her class time reliving the harassment. Her anxiety increased, she had trouble sleeping, she continued to cut herself, and her grades suffered. She became more aggressive, hostile to other people, and afraid to put herself in situations in which other people might touch her, avoiding stores and public transportation. School officials were aware that Maria Doe was struggling

emotionally as they noted a deterioration in her behavior in her IEPs, were aware of the cutting, and knew that Maria Doe's mother had raised concerns about the impact of the harassment during Maria Doe's IEP meeting.

245.    Maria Doe did not return to school after her suspension.

246.    On or about January 14, 2019, Maria Doe requested home instruction because she was unable to participate in school activities and felt isolated and depressed over the repeated incidents.

247.    While Maria Doe was waiting for her request to be approved, she stopped attending school. During this time, and in violation of NYC DOE policy, officials at Collaborative Arts were slow to provide her with school assignments, making it difficult for her to keep up with her classes.

248.    Maria Doe was approved for home instruction on February 25, 2019. Maria Doe had intended to return to public school next year but has expressed significant hesitation and severe anxiety and fear about the possibility of experiencing similar harassment from her peers. Maria Doe's mother is also concerned about her daughter's safety and the risk of continued harassment by peers. Maria Doe could be receiving full-time, in-school instruction if Defendants provided adequate supports, accommodations, and protections to prevent future harassment and to address Maria Doe's mental and emotional health challenges and their impact on her education. Because Defendants have not provided these supports, accommodations, and protections, Maria Doe has been unjustifiably denied a meaningful education.

### Lasting Effects of Maria Doe's Sexual Assaults and Harassment

249.    Maria Doe's home instruction consists of two hours of instruction a day. This is a far cry from services she previously received on her IEP, including the benefit of two teachers,

additional time on assignments and tests, and multiple modalities of learning. The home instruction does not include services that were on her IEP.

250.    Maria Doe estimates that the sexual harassment she experienced and its impact on her mental and emotional health caused her to miss approximately eleven days of school in addition to the nearly four weeks of school that she missed while waiting for approval for home instruction. As described above, the harassment and its impact on Maria Doe also caused her to enter home instruction, further depriving her of educational opportunity.

251.    Maria Doe continues to struggle with anxiety, insomnia, and fear of being around people as a result of the persistent harassment. Maria Doe is currently seeking mental health treatment to help her cope with the emotional impact of the gender-based violence she experienced and her school's response to it. As a result, Maria Doe has incurred costs related to this treatment including, but not limited to, transportation to and from appointments.

252.    Maria Doe informed several school personnel about each of the incidents of harassment. The school officials repeatedly failed to take any steps to curb the harassment. As a result of school officials' failure to address or intervene when it became aware of the harassment, Maria Doe's harassers continued to act with impunity and persisted in touching Maria Doe inappropriately and without her consent. Despite knowledge of these incidents, school personnel, who possessed the authority to take immediate and corrective measures, failed to advise Maria Doe of her rights under Title IX, conduct an investigation, provide a written report, implement either interim or long-term safety measures, or provide support address the effects of the harassment and rape.

253.    As a result of Defendants' acts and omissions alleged, Maria Doe has been denied the ability to meaningfully access her education under Title IX, has been deprived of the ability

to make meaningful progress under the IDEA, and has been deprived of reasonable
accommodations under the ADA and Section 504 of the Rehabilitation Act.

**Plaintiff Lisa Doe**

254.    Lisa Doe is an eighteen-year-old 12th grade student currently attending Harry S.
Truman High School on Baychester Avenue in the Bronx. Lisa Doe identifies as Hispanic. She
previously attended Explorations Academy in the Bronx from October of the 2016-2017 school
year through November of the 2018-2019 school year.

255.    Lisa Doe qualifies for special education services under the disability classification
of learning disabled. Lisa Doe is a qualified individual with a disability under the ADA and
Section 504. Lisa Doe has an IEP with a classification of Learning Disability. She is in an
integrated co-teaching classroom that includes two teachers. She also receives extended time and
testing accommodations.

*Lisa Doe's Sexual Harassment in the Fall of 2018*

256.    On September 25, 2018, A.C., a tenth-grade female student approached Lisa Doe
in the cafeteria during lunch, came up behind her, wrapped her arms around her, and touched
Lisa Doe's vagina. Lisa Doe pushed A.C. away, told A.C. that she did not like being touched like
that, and asked A.C. not to do it again.

257.    On September 26, 2018, A.C. again approached Lisa Doe at lunch and grabbed
Lisa Doe's breast. Lisa Doe pushed her away and again asked A.C. not to touch her.

258.    On September 27, 2018, A.C. engaged in the same behavior, approaching Lisa
Doe and touching her breast without consent or permission.

259.    Upon information and belief, on each occasion, the lunchroom was staffed with
only two of the five school staff tasked with supervising students during lunch.

260.    On September 27, 2018, Lisa Doe approached Assistant Principal Drach in the hallway outside the lunchroom to report the three incidents. Assistant Principal Drach asked Lisa Doe to accompany him to Guidance Counselor Raul Garcia's office and provide a written statement. Lisa Doe obliged and provided a written statement to Assistant Principal Drach, detailing A.C.'s inappropriate and non-consensual touching. Assistant Principal Drach said he would investigate the incidents, and then left Lisa Doe to complete the complaint.

261.    Minutes later, Lisa Doe asked Assistant Principal Drach for permission to leave the school because she was frightened of A.C. and uncomfortable being in the same building with her. Assistant Principal Drach allowed her to leave.

262.    On September 28, 2018, Assistant Principal Jack Hobson updated a previously filed OORS report describing A.C.'s inappropriate touching of multiple students, including an eleventh grade student named J.L. The OORS report update stated that, "Seven students complained that [A.C.] has been touching them inappropriately in their private parts. All seven students have asked her repeatedly to stop and she continues to do so. Students complained she touched them on their butts, their vaginas, and their breasts." The Occurrence Report states that the incident was not bias-related and that the Superintendent was not contacted.

263.    School officials at Explorations Academy facilitated a mediation between A.C. and students who were sexually harassed by A.C. However, Lisa Doe and her mother did not receive any information about the mediation and, as a result, Lisa Doe was not given the opportunity to attend.

264.    Lisa Doe and her mother never attended a mediation about A.C.'s behavior. In spite of this, the OORS report states that Lisa Doe and her mother attended a mediation that was held on Friday, September 30, 2018. Oddly, September 30, 2018 was a Sunday.

265.    School officials at Explorations Academy took inadequate steps to investigate this incident and took no action to protect Jane Doe.

266.    Upon information and belief, Explorations Academy never provided sexual harassment or anti-bullying training to its students, nor did it attempt to disseminate information on these topics through alternative channels such as school-wide assemblies, posting of informative posters in school hallways, or sending materials home with students to review with their families.

267.    Explorations Academy does not provide clear access to Title IX resources and obligations to parents or students through their website. The school's homepage contains no links to its Title IX or anti-discrimination policies.[42]

268.    According to an Occurrence Report, A.C. was suspended for sexually harassing multiple students. Upon information and belief, A.C. served her suspension at Explorations Academy on September 28 and October 1 between the hours of 2 and 4 p.m.[43]

269.    Lisa Doe frequently saw A.C. in the hallways during A.C.'s suspension. These encounters made Lisa Doe feel anxious and afraid, and she felt as if A.C. was preying upon her.

270.    Beginning after the first incident, Lisa Doe felt anxious and sensitive in and out of school. Her mother noticed that she became jumpy and often looked over her shoulder while out in public. Lisa Doe felt fearful of A.C. and attempted to avoid her in school.

---

[42] Explorations Academy, http://www.explorationsnyc.us/home (last visited April 19, 2019).

[43] Given the NYC DOE's own regulations governing the timelines for student discipline investigations and due process notifications, it is unlikely that A.C.'s suspension was issued in response to Lisa Doe's complaint.

***Lisa Doe's Assault in October 2018 and Exploration Academy's Improper Response***

271.    On October 1, 2018, during A.C.'s suspension, A.C. approached Lisa Doe, Lisa Doe's younger sister, and J.L., another female student, after school at a public bus stop one block from school grounds. A.C. confronted Lisa Doe and J.L. and asked them why they got her suspended. A.C. told Lisa Doe that she should have stayed quiet and that the suspension was "all [Lisa Doe's] fault." Lisa Doe responded that she did not want any trouble, but A.C. threatened the girls, stating that she wanted to fight Lisa Doe and J.L. A.C. then assaulted Lisa Doe. Lisa Doe's sister came to her aid and, ultimately, bystanders separated A.C. from Lisa Doe and her sister. Lisa Doe and her sister were then able to depart on the bus. Lisa Doe's sister sustained physical injuries for which she sought medical treatment.

272.    On the morning of October 2, Lisa Doe went to the main office at Explorations Academy and asked to speak with Assistant Principal Drach. Assistant Principal Drach asked Lisa Doe to accompany him to Assistant Principal Jack Hobson's office. Assistant Principal Hobson, who had just discussed the incident with A.C., told Lisa Doe that she would be suspended because she assaulted A.C. Lisa Doe then told Assistant Principals Drach and Hobson that, in fact, A.C. assaulted her.

273.    Assistant Principal Drach left Assistant Principal Hobson's office and returned with a complaint form. He asked Lisa Doe to join him in Guidance Counselor Raul Garcia's office, and Lisa Doe obliged. Assistant Principal Drach instructed her to complete the form with her description of the October 1 incident at the bus stop. Assistant Principal Drach and Guidance Counselor Garcia left Lisa Doe alone for approximately twenty minutes while she completed the form. They locked the door when they left.

274.    When Assistant Principal Drach returned to Guidance Counselor Garcia's office, he began to mock and laugh at Lisa Doe, telling her that he did not believe her version of the story. Lisa Doe became upset and asked Assistant Principal Drach how he could say such a thing without hearing her full version of events. Lisa Doe had a panic attack, began crying, and did not feel safe with Assistant Principal Drach.

275.    Lisa Doe got up and told Assistant Principal Drach and Guidance Counselor Garcia that she no longer felt safe and wanted to leave. Guidance Counselor Garcia told her to stay and calm down. Lisa Doe then called her mother and told her that Assistant Principal Drach and Guidance Counselor Garcia would not allow her to leave. While Lisa Doe was on the phone with her mother, Assistant Principal grabbed Lisa Doe's arm and attempted to prevent her from leaving. Lisa Doe's mother told her to leave the school, and she departed without signing out.

276.    On October 4, Lisa Doe's mother went to Explorations Academy. She met with Guidance Counselor Garcia, who helped her complete the necessary paperwork to request a safety transfer for Lisa Doe.

277.    Between September 27 and October 5, Lisa Doe reports that she missed three and a half days of school because she feared that A.C. would sexually assault, assault, or threaten her again.

### Suspension from Explorations Academy and Denial of Safety Transfer

278.    Lisa Doe had no disciplinary history and yet, on October 5, she was suspended for the October 1 incident at the bus stop and was made to serve the suspension at another school for twenty days.

50

279.    In the incident report that Mr. Drach submitted to request Lisa Doe's suspension, Mr. Drach wrote that Lisa Doe participated in the altercation because she was "still angry about being sexually harassed by" A.C.

280.    Upon information and belief, A.C. was not disciplined for the October 1 incident at the bus stop.

281.    Defendants, by and through their suspension of Lisa Doe, retaliated against Lisa Doe for reporting the sexual assaults that she experienced.

282.    From October 5 to October 31, Lisa Doe served her suspension at Monroe High School.  During this time, Lisa Doe was not afforded any of the special education services mandated by her IEP, nor was she offered any counseling or support to help her with the traumatic effects of the incidents at Exploration Academy.

283.    On October 25, 2018, a suspension hearing was held to address Lisa Doe's role in the altercation. During this hearing, Larry Arias, the suspension hearing officer, upheld the suspension and refused to admit evidence of the sexual harassment and its connection to the altercation.

284.    During the October 25 suspension hearing, Lisa Doe and her mother, by and through counsel, reiterated her request for a safety transfer.

285.    School officials at Explorations Academy were aware that Lisa Doe was experiencing mental, behavioral, and emotional health challenges as a result of the sexual assault. On October 29, 2018, Guidance Counselor Raul Garcia stated, in the presence of Lisa Doe's mother and counsel, that Lisa Doe exhibited symptoms of post-traumatic stress and anxiety after A.C. sexual assaulted her.

286.     On October 31, Assistant Principal Drach called Lisa Doe's mother to inform her that Lisa Doe's safety transfer request was denied and that she was required to return to Explorations Academy.

287.     Lisa Doe did not feel safe returning to Explorations Academy because A.C. was still attending the school and because she feared that school personnel would mock her and fail to protect her if she were attacked again. As a result, Lisa Doe did not return to Explorations Academy and did not attend school between October 31 and November 13.

**_Explorations Academy's Failure to Convene Lisa Doe's Annual IEP_**

288.     Lisa Doe had her last IEP meeting on October 25, 2017.

289.     Lisa Doe was due for her annual IEP review before the end of October 2018.

290.     Although Explorations Academy staff recognized that Lisa Doe was manifesting trauma-related symptoms, did not convene an IEP review to address the impact of the sexual harassment.[44] This failure is particularly egregious given that Lisa Doe should have been scheduled for her statutorily-guaranteed annual IEP review before the end of October 2018.

291.     To date, the DOE has yet to convene any IEP meeting for Lisa Doe, thus precluding Lisa Doe from receiving services, supports, and accommodations to address the impact of her sexual harassment.

292.     Explorations Academy failed to properly assess the impact of sexual assault on Lisa Doe's need for special education services.

**_Lisa Doe's Transfer to Harry S. Truman High School_**

---

[44] To date, the DOE has yet to convene any IEP meeting, thus precluding Lisa Doe from receiving services, supports, and accommodations to address this impact.

293.    On November 9, Lisa Doe and her mother traveled to the NYC DOE Family Welcome Center located on Zerega Avenue in the Bronx. They requested a safety transfer for Lisa Doe, and it was granted immediately.

294.    On November 13, Lisa Doe began attending Harry S. Truman High School.

295.    On November 13, Lisa Doe's mother spoke with a representative of Harry S. Truman High School while processing Lisa Doe's transfer paperwork. She informed the representative that Lisa Doe had surpassed the year mark since her last IEP meeting and needed an IEP review as soon as possible. She spoke with a representative of the school while processing Lisa Doe's paperwork for the transfer.

296.    The IEP team at Harry S. Truman High School has access to Lisa Doe's student records and, therefore, was aware of the harassment she experienced at Explorations Academy.

297.    Despite being aware of Lisa Doe's mental and emotional health challenges, the school did not re-open Lisa Doe's IEP or evaluate her for a change in disabilities.

298.    Harry S. Truman High School failed to properly assess the impact of sexual assault on Lisa Doe's need for special education services.

299.    In December 2018, Lisa Doe was asked to meet with an unknown individual believed to be from the NYC DOE's Office of the Special Commissioner of Investigations. Harry S. Truman High School's Respect for All Liaison Katharine Mourino was also present at the meeting. The unknown individual discussed the incidents involving A.C. and Explorations Academy's response and asked Lisa Doe questions.

300.    Despite being present for this discussion, Ms. Mourino never followed up with Lisa Doe to inquire about how she was coping with the trauma or to determine whether she requires additional services.

301.    Harry S. Truman High School is not providing Lisa Doe with additional services to address the effects of the traumatic incidents that she experienced.

### Lasting Effects of the  Sexual Assault on Lisa Doe

302.    Lisa Doe estimates that the sexual assault she experienced and its impact on her mental and emotional health have caused her to miss approximately one full day and four partial days of school since she began Harry S. Truman High School, in addition to the time she missed while awaiting her safety transfer.

303.    Prior to the sexual harassment incidents, Lisa Doe's educators noted that she was "a happy student who hates to fight with others." She was a socially engaged student who was excited about her education.

304.    As a result of the persistent harassment, and the altercation on October 1, Lisa Doe continues to experience anxiety and fear about attending school.

305.    Lisa Doe is afraid to go outside and only feels comfortable traveling with her mother. She also has difficulty sleeping and eating normally and began experiencing increased anxiety and depression. She was recently prescribed an increased dosage of Vistaril, a sleep medication, to address these issues. Lisa Doe describes feeling groggy each morning after she takes Vistaril.

306.    Lisa Doe's increased anxiety has resulted in her experiencing regular panic attacks. Beginning in January 2019, these panic attacks have occurred approximately every other day. They are often triggered when classroom discussions involve themes related to violence or sexual assault. When this occurs, Lisa Doe begins to shake and cannot understand what her teacher is saying. As a result, Lisa Doe often has to exit the classroom mid-lesson and, upon return, has difficulty concentrating.

307.    Because of these post-traumatic health challenges, Lisa Doe's engagement in her education has significantly diminished.[45] She has experienced a drop in grades, including in English Language Arts, social studies, and foreign language classes. She struggles to stay awake in class and finish her schoolwork during the given class period. Consequently, she has had difficulty following the progression of concepts in the classroom.

308.    Lisa Doe's teachers have noticed these issues, have reported them to Lisa Doe's mother, and have intermittently provided Lisa Doe with additional time to complete assignments. Lisa Doe was recently prescribed the medication Concerta because of her difficulty concentrating and paying attention in school.

309.    Lisa Doe is currently seeking mental health treatment to help her cope with the emotional impact of the gender-based violence she experienced and her school's response to it. As a result, Lisa Doe has incurred costs related to this treatment including, without limitation, medication and transportation to and from appointments.

310.    Officials at both schools failed to properly assess these challenges and their impact on Lisa Doe's need for special education services.

311.    This failure is part of Defendants' pattern and practice of failing to conduct special education re-evaluations of children who are exhibiting trauma-related mental, behavioral, and emotional health challenges as a direct result of gender-based violence.

312.    Lisa Doe informed Defendants about each of the incidents of harassment. Defendants failed to take any steps to curb the harassment. As a result of the Defendants' failure to address or intervene when they became aware of the sexual harassment, A.C. continued to

---

[45] Because Lisa Doe's IEP team has not convened since the assaults, Lisa Doe has not received an updated IEP reflecting her progress or lack thereof on previous IEP goals.

engage in a pattern of harassment with impunity against Lisa Doe. Despite knowledge of these incidents, Defendants' employees, who possessed the authority to take immediate and corrective measures, failed to advise Lisa Doe of her rights under Title IX, conduct an investigation, provide a written report, implement either interim or long-term safety measures, or provide support address the effects of the harassment and rape.

313.    On October 27, 2018, Lisa Doe's mother, by and through counsel, filed a complaint with the NYC DOE's Special Commissioner of Investigation regarding, among other things, Defendants' failure to disclose a written report of Exploration Academy's sexual harassment investigation findings in violation of Title IX. To date, Lisa Doe and her mother have received no written report of the investigation findings.

314.    As a result of Defendants' acts and omissions alleged, Lisa Doe has been denied the ability to meaningfully access her education under Title IX and has been deprived of the ability to make meaningful progress under the IDEA, under Section 504 of the Rehabilitation Act, and under the ADA.


**Gender-Based Violence in Schools**

*Prevalence of Sexual Assault and Harassment in K-12*

315.    Sexual harassment is pervasive in junior high school and high school. Female students are more likely than male students to experience all forms of sexual harassment, with fifty-six percent of female students in the seventh to twelfth grades experiencing sexual

harassment in a given school year.[46] In addition, more than one in three high school girls reported being sexually assaulted by their peers.[47]

316.    Schools underreport gender-based violence. Despite the above research, more than three-fourths of the 48,000 public schools in the U.S. with students in seventh through twelfth grade reported zero allegations of harassment or bullying on the basis of sex.[48]

317.    These trends are even more troubling for students with disabilities. Nationwide, children with disabilities are 2.9 times more likely than non-disabled children to be sexually assaulted and, consequently, to suffer from post-traumatic effects on academic performance.[49] In addition, children with disabilities are "less likely to be believed" when they do report sexual assault, placing them at even higher risk of re-victimization and untreated mental health impacts.[50]

---

[46] Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, Am. Ass'n of Univ. Women (Nov. 2011), available at https://files.eric.ed.gov/fulltext/ED525785.pdf. A study funded by the National Institute U.S. Department of Justice found that more than 68% of girls and 55% of boys report being sexually harassed at some point in high school. *See* Dorothy L. Espelage, Sabina K. Low, et al., *Bullying, Sexual, and Dating Violence Trajectories from Early to Late Adolescence* 12 (May 2014), available at https://www.ncjrs.gov/pdffiles1/nij/grants/246830.pdf.

[47] Amy M. Young, Melissa Grey, & Carol J. Boyd, *Adolescents' Experiences of Sexual Assault by Peers: Prevalence and Nature of Victimization Occurring Within and Outside School*, 38 J. Youth Adolescence 1072, 1078 (2009), available at http://www.ccasa.org/wp-content/uploads/2014/01/adolescents-experiences-of-sexual-assault-by-peers.pdf.

[48] *Schools Are Still Underreporting Sexual Harassment and Assault*, Am. Ass'n of Univ. Women (Nov. 2, 2018), https://www.aauw.org/article/schools-still-underreporting-sexual-harassment-and-assault/.

[49] *Violence against adults and children with disabilities*, World Health Org. (2019), https://www.who.int/disabilities/violence/en/.

[50] Nancy Smith & Sandra Harrell, *Sexual Abuse of Children with Disabilities: A National Snapshot*, Vera Inst. of Justice 8 (Mar. 2013), available at https://storage.googleapis.com/vera-web-assets/downloads/Publications/sexual-abuse-of-children-with-disabilities-a-national-snapshot/legacy_downloads/sexual-abuse-of-children-with-disabilities-national-snapshot-v3.pdf.

### *The Impact of Sexual Assault and Harassment on Academic Performance*

318.    Students who are victims of sexual harassment experience changes in behavior that inhibit their ability to participate in the classroom.[51] These students are more likely than other students to miss school, skip class, think about changing schools, have difficulty concentrating, participate less in class, produce lower quality schoolwork, receive lower grades, lose friends, and have difficulty sleeping, eating regularly, following lessons, and sitting still.[52]

319.    Students experiencing trauma-related disabilities are also likely to suffer from cognitive, neurological, and behavioral changes that "severely interfere with school functioning."[53] These changes include poor concentration, intrusive thoughts, disorganized behavior, agitation and irritability, avoidant behaviors, decreased IQ and reading ability, decreased social competence, and increased rates of peer rejection.[54]

320.    One study found a "direct and compelling" link between sexual assault and poor academic performance.[55] A student who experiences even an isolated incident of sexual assault typically experiences a drop in grades that is correlated with the severity of the assault. Students

---

[51] The plaintiffs in this case identify as female. As such, all references to Plaintiffs use the pronouns "she" and "her." However, sexual assault and sexual harassment affect students of all genders and sexual identities. In recognition of this reality, general discussions of gender-based violence contained in this Complaint use the pronouns "they," "them," and "their."

[52] James Gruber & Suan Fineran, *The Impact of Bullying and Sexual Harassment on Health Outcomes of Middle School and High School Girls*, 13 Violence Against Women 2, 627-43 (2007); *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence*, NAT'L WOMEN'S LAW CTR., 8 (2017), available at https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/final_nwlc_Gates_HarassmentViolence.pdf.

[53] Sheryl Kataoka, Audra Langley, et al., *Responding to Students with PTSD in Schools*, 21 Child Adolesc. Psychiatr. Clin. N. Am. 1, 2 (Jan. 2012), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3287974/pdf/nihms353958.pdf.

[54] *Id.* at 1.

[55] Gail Harston, *Sexual Assault Can Inhibit Student Success*, U. of Kentucky C. of Arts & Sci. (Nov. 20, 2014), https://psychology.as.uky.edu/sexual-assault-can-inhibit-student-success.

who experienced a forcible rape experienced the most dramatic impact, with 14.3 percent ending the semester with a GPA below 2.5.[56]

321.    The study also found that sexual assault and harassment can produce post-trauma reactions, including the cognitive and behavior changes described above, Post-Traumatic Stress Disorder (PTSD), Acute Stress Disorder, eating disorders, anxiety, depression, and suicide.[57]

322.    Some students are more likely than others to develop PTSD or other trauma related disabilities after a traumatic incident. Female students, students with a history of mental disorders, students with parents who have a history of mental disorders, and students who lack parental support following a trauma are more likely to develop PTSD.[58] Interpersonal traumas, like those experienced by Plaintiffs, are also more likely to result in PTSD.[59]

323.    Rape victims are especially likely to develop PTSD. Approximately ninety-four percent of women who are raped experience PTSD symptoms in the two weeks following the rape. Nine months after the rape, thirty percent of women continue to experience PTSD symptoms.[60]

324.    Retraumatization, or a reminder of past trauma that causes the survivor to re-experience the initial trauma, can occur when a student is exposed to their assailant, hears

---

[56] *Id.*

[57] Kataoka, *supra* note 54, at 2.

[58] *Id.* at 2.

[59] *Id.* at 2.

[60] *PTSD: Sexual Assault Against Females*, Nat'l Ctr. for PTSD (Sept. 24, 2018), https://www.ptsd.va.gov/professional/treat/type/sexual_assault_female.asp.

insensitive comments about their experience, or is placed in an environment that replicates the dynamics of the original trauma, such as loss of power, control, or safety.[61]

325.    Retraumatization can cause higher rates of self-injury; significantly less willingness to engage in treatment; an increase in intrusive memories, nightmares and flashbacks; re-experiencing of symptoms and emotions from previous trauma; and an increase in chronicity of stress with a greater risk for psychiatric morbidity, including PTSD and chronic depression.[62]

326.    All four Plaintiffs experienced changes in behavior after their sexual assault that impacted their academic performance, including difficulty concentrating, decreased engagement with schoolwork and class assignments, memory problems, fear of attending school, sleeping in class, a drop in grades, and a measurable failure to progress on their IEP goals.

### *Providing Special Education Services in Response to Traumatic Incidents*

327.    A recent study on PTSD in students found that schools are an "ideal setting for mental health professionals to intervene with traumatized students."[63] PTSD and other cognitive, emotional, and behavioral reactions impair a student's ability to interact with their educational environment. Special education services, supports, and accommodations can help address trauma-related psychological problems and impairments that manifest in the classroom.[64]

---

[61] Patricia Shelly, Shelley Hitzel, & Karen Zgoda, *Preventing Retraumatization: A Macro Social Work Approach to Trauma-Informed Practices & Policies*, The New Social Worker (Feb. 18, 2016), https://www.socialworker.com/feature-articles/practice/preventing-retraumatization-a-macro-social-work-approach-to-trauma-informed-practices-policies/.

[62] *Id.*

[63] Kataoka, *supra* note 54, at 1.

[64] Cara Nissman, *Make trauma-informed considerations in IEP development*, SpecialEdConnection (May 18, 2018) (on file with counsel).

328.    To satisfy IDEA and Section 504 requirements that students be assessed for all areas of suspected disability and that assessments consider any cognitive or behavioral factors affecting the student's educational performance, school officials should take certain steps to ensure that evaluations are capable of assessing trauma-related disabilities.[65] The Federation for Children with Special Needs recommends that special education evaluations address the role of recent trauma in learning, behavior, and social/emotional growth.[66] This enables the school to map out trauma symptoms that are inhibiting the student's educational success.[67]

329.    To satisfy the IDEA's requirements for a properly developed IEP, IEP teams should adopt services and accommodations that permit students with trauma-related disabilities to make meaningful academic progress.[68] These may include action plans that map out educator responses in the event of a traumatic reaction, positive behavioral interventions and supports (PBIS), removal of setting elements likely to trigger traumatic reactions, movement and sensory services and spaces to promote de-escalation and concentration, student-specific trauma-sensitive training for school staff, and evidence-based programs for responding to students with PTSD and trauma-related disabilities.[69]

330.    To satisfy the IDEA's requirements for a properly developed IEP, IEP teams should also institute annual goals that permit a student with trauma-related disabilities to make

---

[65] *Trauma-Sensitive Assessment and Planning Checklist*, Nat'l Ctr. on Safe Supportive Learning Env't 1, available at https://safesupportivelearning.ed.gov/sites/default/files/Building_TSS_Handout_6assessment_and_planning.pdf.

[66] *Trauma Sensitivity During the IEP Process*, Fed'n for Child. with Special Needs 2 (2013), available at https://fcsn.org/rtsc/wp-content/uploads/sites/2/2013/11/Trauma-Sensitivity-During-the-IEP-Process.pdf.

[67] *Id.*

[68] *See generally*, Felicia F. Winder, *Childhood Trauma and Special Education: Why the IDEA Is Failing Today's Impacted Youth*, 44 Hofstra L. Rev. 601 (2015), available at https://www.hofstralawreview.org/wp-content/uploads/2016/03/EE.2.Winder.final1_.pdf.

[69] *Id.* at 630.  For a description of two such evidence-based programs, *see* Kataoka, *supra* note 54, at 23.

meaningful progress in the general education curriculum. This includes goals that promote the student's ability to manage and address their trauma-related disabilities.[70]

331.    In some instances, a student who receives IEP services for other disabilities may have trauma-related disabilities that do not require the placement, services, or accommodations offered in an IEP. However, the student may nevertheless require accommodations under Section 504, in the form of aids and services, to ensure that their educational needs are met.[71] When this occurs, the student should be referred to the Committee on Special Education to be assessed, and an IEP meeting should be held to consider the necessary accommodations, and accommodations deemed necessary should be added to the student's IEP.

332.    For students with trauma-related disabilities, reasonable accommodations under Section 504 may include frequent breaks, preferential seating, reduction in stimuli to avoid triggers that lead to dysregulation, or advance notice when schedules or daily routines change.[72]

## NYC DOE's Systemic Failure to Address Gender-Based Violence

### *Underreporting of Gender-Based Violence Incidents*

333.    New York State requires all schools to report violent or disruptive incidents as well as incidents of discrimination, harassment, bullying, and cyberbullying under the School Safety and the Educational Climate ("SSEC") data collection program.  Certain forcible sex offenses are included within the reporting. During the 2017-2018 school year, NYC schools

---

[70] For best practices on and examples of such goals, *see* Kataoka, *supra note* 54, at 9; Nissman, *supra* note 65.

[71] U.S. Dep't of Educ., Office for Civil Rights, *Parent and Educator Resource Guide to Section 504 in Public Elementary and Secondary Schools* 15 (Dec. 2016), available at https://www2.ed.gov/about/offices/list/ocr/docs/504-resource-guide-201612.pdf.

[72] Kataoka, *supra note* 54, at 6; Adeshina Emmanuel, *Trauma can make it hard for kids to learn. Here's how teachers learn to deal with that.*, Chalkbeat (Aug. 1, 2018), https://www.chalkbeat.org/posts/chicago/2018/08/01/trauma-can-make-it-hard-for-kids-to-learn-heres-how-teachers-learn-to-deal-with-that/.

reported nearly 3,400 sexual assaults, or 18.9 per day.[73] Sexual assault reports during the 2017-2018 school year increased by nearly 800 from the 2016-2017 school year and by over 1,000 from the 2015-2016 school year.[74]

334.    The NYC DOE also collects and reports information from each school district on the number of sexual harassment incidents that were investigated and verified by the school district.[75] Disparities between NYC DOE reports and reporting from the rest of the state suggest that NYC DOE's numbers do not capture the full extent of gender-based violence occurring in NYC DOE schools.

335.    There are approximately 1.1 million students enrolled in NYC DOE schools, and approximately 1.6 million enrolled in New York state schools outside of New York City.[76] During the 2016-2017 school year, the NYC DOE reported only 590 material incidents of sexual and gender harassment while the rest of New York State reported 1,739 material incidents of sexual and gender harassment.[77] Similarly, during the 2015-2016 school year, NYC DOE

---

[73] This is the most recent year for which DASA data is publicly available. To access SSEC data cited here, *see School Safety and the Educational Climate: Data Reporting*, NYSED Information and Reporting Services (Feb. 23, 2018) http://www.p12.nysed.gov/irs/school_safety/school_safety_data_reporting.html [hereinafter SSEC Data Reporting]. New York Education Commissioner's Regulation 100.2(kk)(1)(viii), defines incidents of harassment or bullying to be reported under DASA. *Glossary of Terms Used in the Annual Reporting of Incidents Concerning School Safety and Educational Climate (SSEC)*, NYSED (June 20, 2018), http://www.p12.nysed.gov/sss/ssae/schoolsafety/vadir/glossary201718.html. Sexual orientation-based incidents include incidents based on "actual or perceived heterosexuality, homosexuality, or bisexuality." N.Y. Educ. Law §11[5].

[74] SSEC Data Reporting, *supra* note 74.

[75] NYC DOE does not collect information on the number of sexual harassment incidents that were reported but not investigated by the school.

[76] *See DOE Data at a Glance*, NYC Dep't of Educ. (2018), https://www.schools.nyc.gov/about-us/reports/doe-data-at-a-glance; *Public School Enrollment*, NYSED (April 4, 2019), http://www.p12.nysed.gov/irs/statistics/enroll-n-staff/home.html.

[77] SSEC Data Reporting, *supra* note 74.

reported 503 incidents of sexual and gender harassment in the NYC DOE schools, while the state reported 1,664 incidents.[78]

336.    This disparity is startling: New York City's population is roughly 43.44% of the state's overall population, but accounted for only 25.33% of the state's gender and sexual discrimination and harassment reports during the 2016-2017 school year and 23.21% during the 2015-2016 school year.[79] These numbers suggest rampant underreporting indicative of a systemic failure to recognize, respond to, and prevent sexual harassment and assault.

337.    These disparities caught the attention of the New York Attorney General. The Attorney General's Office launched an investigation in response to reporting from the 2013-2014 school year, during which seventy percent of NYC schools reported zero instances in which a student was bullied, harassed, or discriminated against and ninety-eight percent of schools reported fewer than ten incidents within the year.[80]

338.    In August 2016, the Attorney General's Office released a report, in the form of a letter, documenting its investigation and resulting concerns.[81] The letter observed that reporting levels "suggest both significant underreporting of material incidents of harassment and discrimination by schools in New York City, along with some confusion or uncertainty as to how to classify those incidents that are reported."[82]

---

[78] *Id.*

[79] *See QuickFacts: New York: New York City, New York*, U.S. Census Bureau (July 1, 2018), https://www.census.gov/quickfacts/fact/table/ny,newyorkcitynewyork,US/PST045218.

[80] New York State Educ. Dep't and New York Office of the Att'y General, Letter to District Superintendents on Dignity for All Students Act: Results of Statewide School District Survey and Guidance on Implementation 3 (Aug. 31, 2016), available http://www.p12.nysed.gov/dignityact/documents/SED-AGLttrandGuidance8-31-16.pdf [hereinafter "New York Att'y General Letter on DASA"].

[81] *See generally id.*

[82] *Id.* at 4.

339.    The New York City Comptroller recently conducted an investigation of this issue. In 2018, the Comptroller found that NYC DOE "failed to report hundreds of incidents to the State Education Department, resulting in skewed school violence ratings."[83] In an audit of only ten schools, the Comptroller's auditors found "more than 400 incidents that were never reported to state officials."[84]

340.    More recently, the New York State Comptroller released a 2019 audit of the NYC DOE's implementation of DASA.[85] The audit found that, for the 2015-16 and 2016-17 school years, NYC DOE failed to identify and report any material incidents for 670 schools and 570 schools, respectively.[86]

341.    The audit noted that incidents were not consistently reported  because "school staff had differing views" of when and how to documents incidents or complaints of discrimination, harassment, intimidation, or bullying.[87]

### A Culture of Indifference to Gender-Based Violence

342.    This underreporting is part of a broader NYC DOE school culture of indifference to gender-based violence that affects both staff and students.

343.    Girls for Gender Equity ("GGE"), a community-based research and advocacy organization, conducted two research studies involving a total of over 1,300 NYC DOE

---

[83] New York City Comptroller, *Safe and Supportive Schools: A Plan to Improve School Climate and Safety in NYC* 14 (June 2018), available at https://comptroller.nyc.gov/wp-content/uploads/documents/School-Climate.pdf [hereinafter "New York City Comptroller"].

[84] *Id.*

[85] New York State Office of the State Comptroller, *Implementation of the Dignity for All Students Act: New York City Department of Dep't of Ed.* (Mar. 13, 2019), available at https://www.osc.state.ny.us/audits/allaudits/093019/sga-2019-17n6.pdf.

[86] *Id.* at 8.

[87] *Id.* at 2.

students.[88] The study found that NYC DOE schools have a culture that has normalized sexual harassment and gender-based violence.[89] This culture most acutely impacts girls of color and transgender and gender nonconforming youth.[90]

344.    One in three students interviewed by GGE reported experiencing some form of sexual harassment in school.[91] Sixty-four percent of students said that sexual harassment occurred at their schools, over seventy percent reported that sexual comments or jokes occurred at their school, over thirty percent reported that pressure to participate in sexual activity occurred at their school, and approximately ten percent reported that forced sexual activity occurred at their school.[92]

345.    The study also found that students who report their harassment to NYC DOE officials do not receive adequate support.[93]

346.    Defendants have been on notice of their system-wide failure to address gender-based violence since at least 2015-2016, when three complaints were filed on behalf of individual claimants attending schools in the NYC DOE, all of which alleged gender-based violence, with the U.S. Department of Education's Office for Civil Rights.[94]

---

[88] *Participatory Action Research*, Girls for Gender Equity (2018), https://www.ggenyc.org/programs/community-organizing/participatory-action-research/ (hereinafter "*Participatory Action Research*".

[89] Girls for Gender Equity, *The Schools Girls Deserve* 23 (2017), available at https://www.ggenyc.org/wp-content/uploads/2017/11/GGE_school_girls_deserveDRAFT6FINALWEB.pdf.

[90] *Id.* at 10.

[91] *Id.* at 23.

[92] *Participatory Action Research*, *supra* note 89.

[93] *Id.*

[94] Investigations of these three complaints, as well as investigations of two Title IX retaliation complaints and one Title IX procedural requirements complaint, remain open as of March 29, 2019. *Pending Cases Currently Under*

347.    Defendants have also been on notice since the 2018 Attorney General's report and 2019 State Comptroller report, detailed above.

## NYC DOE's Unlawful Policies, Patterns, and Practices

### *Failure to Satisfy the Title IX Coordinator Requirement*

348.    Every school district receiving federal funding is required to designate at least one Title IX coordinator who is responsible for training faculty, staff, and students on rights and obligations under Title IX. The Office for Civil Rights has stated that "it may be good practice" for larger school districts to designate multiple Title IX coordinators, such as one for each school or school campus. [95]

349.    The NYC DOE has only one Title IX Coordinator for the entire school district of 1.1 million students and 300,000 staff.  This one individual is responsible for responding to and investigating NYC public schools' reported 2,600 sexual harassment incidents per year, or 14.4 sexual harassments incident per day.

350.    By way of comparison, other cities with smaller school districts have more than one Title IX coordinator. The Los Angeles Unified School District has one Title IX Coordinator for 694,096 students as well as one Title IX manager at each school.[96] The Chicago Public

---

*Investigation at Elementary-Secondary and Post-Secondary Schools*, U.S. DEP'T OF EDUC. (Mar. 29, 2019), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/open-investigations/tix.html.

[95] 2015 Guidance on Title IX Coordinators, *supra* note 5, at 1, 3.

[96] *See Title IX – Sex Based Nondiscrimination Statute*, L.A. Unified School District, https://achieve.lausd.net/Page/3654; *L.A. Unified Fingertip Facts 2018-2019*, L.A. Unified School District (2018), available at https://achieve.lausd.net/site/handlers/filedownload.ashx?moduleinstanceid=47248&dataid=68431&FileName=Fingertip%20Facts2018-19_EnglishFinalDS.pdf; *Title IX Policy/Complaint Procedures*, L.A. Unified School District Policy Bulletin 7 (Feb. 14, 2018), available at https://achieve.lausd.net/cms/lib/CA01000043/Centricity/Domain/383/BUL-2521.2%20Title%20IX.pdf.

Schools District has two Title IX Coordinators for 361,314 students.[97] In stark contrast to the NYC DOE's staffing of the Title IX coordinator position, Harvard University employs 50 Title IX Coordinators for its 36,000 students and more than 12,000 staff.[98]

351.    According to federal regulations, the Title IX coordinator should be a full-time position and must not have any other job responsibilities that may create a conflict of interest.[99] Nevertheless, the current interim Title IX coordinator is serving as the Diversity Unit Chief, a position in the NYC DOE's Office of General Counsel. With multiple roles, she has less time to devote to training and support in the Title IX capacity. This position creates a conflict of interest by placing the Title IX Coordinator in a position to both investigate Title IX complaints and defend the NYC DOE against Title IX claims.[100]

352.    DASA requires every school in New York to designate a DASA coordinator to respond to incidents of bias-based harassment, bullying, or discrimination.[101] In accordance with

---

[97] Feminist Majority Foundation, Education Equality Program, *State & Large School District Title IX Gender Equity Coordinators, Methods of Administration Coordinators & Other State & District Level Gender Equity Experts* 13 (Feb. 6, 2019), available at http://www.feminist.org/education/pdfs/State-TitleIX-Coordinators.pdf; *CPS Stats and Facts*, Chicago Public Schools (Apr. 1, 2019), https://cps.edu/About_CPS/At-a-glance/Pages/Stats_and_facts.aspx.

[98] *See* Harvard Office for Dispute Resolution, Title IX Office, *FY18 Annual Report* 4 (2018), available at https://titleix.harvard.edu/files/titleix/files/title_ix_odr_2018_annual_report_final_121218_for_web.pdf; *Harvard at a Glance*, Harvard University, https://www.harvard.edu/about-harvard/harvard-glance (last visited Apr. 20, 2019).

[99] 2015 Guidance on Title IX Coordinators, *supra* note 5, at 3.

[100] "Title IX Coordinators should not have other job responsibilities that may create a conflict of interest. Because some complaints may raise issues as to whether or how well the school has met its Title IX obligations, designating the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest." *Preventing and Responding to Sexual Assault on College Campuses: Hearing Before the Subcomm. On Higher Education and Workforce Training of the Comm. On Education and the Workforce*, 114th Cong. 27 (2015).

[101] N.Y. Educ. L. Art. 2 § 13.

its DASA obligations, the NYC DOE designates one DASA/RFA Liaison in each school to handle student reports of harassment, discrimination, intimidation, and bullying.[102]

353.    However, as described in paragraphs 341 and 344, DASA/RFA Liaisons lack the qualifications, training, and authority required of Title IX Coordinators.

354.    Defendants do not provide clear notice to students and families of the role of the DASA/RFA Liaison in reporting and responding to harassment and discrimination. As a result, according to the NYC Comptroller, "many students were unable to identify their school's DASA coordinator when surveyed."[103] In addition, according to the Comptroller's Office, "numerous accounts from schools and advocates" indicated that "the Respect for All/DASA coordinator is not consistently implemented in all schools."[104]

### *Failure to Provide Notice to Students and Families*

355.    Defendants fail to provide students and employees within NYC DOE with sufficient information regarding the school district's Title IX Coordinator in violation of Title IX and its regulations.

356.    Girls for Gender Equity, in conjunction with other organizations, conducted a study during the 2010-2011 school year to determine how many NYC public schools were able to, upon request, name the NYC DOE's Title IX Coordinator. When asked if there was a staff person designated to receive sexual harassment complaints, the study found that only 5% of

---

[102] *Respect for All: Fostering Anti-Bullying Practices*, NYC Dep't of Educ. (2019), https://www.schools.nyc.gov/school-life/policies-for-all/respect-for-all (last visited Apr. 22, 2019).

[103] New York City Comptroller, *supra* note 84, at 10.

[104] *Id.*

contacted schools were able to identify the coordinator and provide the caller with contact information.[105]

357.   Defendants also do not provide clear access to Title IX resources and obligations to parents or students through their website. NYC DOE's homepage contains no links to its Title IX or anti-discrimination policies.[106] The NYC DOE homepage does not provide notice of the NYC DOE's obligations under Title IX, does not describe how families or students can identify in-school resources, and does not describe supports or interventions for students who have experienced gender-based violence.

358.   Defendants also fail to provide students and employees with adequate information about Title IX policies, adequate notice of students' rights and protections under Title IX, and adequate notice of schools' obligations under Title IX in violation of Title IX and its regulations.

359.   A June 2018 report by the New York City Comptroller's Office found that NYC DOE did not provide students and families with information about resources available in the event of sexual harassment or assault.[107]

360.   As a consequence of Defendants' failures, Plaintiffs did not know how to appropriately report their sexual assault to the Title IX Coordinator.

### Failure to Train and Support School Personnel

361.   Defendants do not provide adequate training, resources, or support for their employees on how to identify gender-based violence, how to properly investigate complaints,

---

[105] *Participatory Action Research, supra* note 89.

[106] NYC Dep't of Educ., https://www.schools.nyc.gov/ (last visited Apr. 21, 2019).

[107] New York City Comptroller, *supra* note 84, at 10-11.

how to properly document and report incidents, how to devise interim measures to protect

victims of gender-based violence, and how to prevent further incidents of gender-based violence.

362.    School personnel also do not receive training on the impact of sexual harassment,

gender-based violence, or its effect on a student's ability to learn.

363.    Upon information and belief, NYC DOE teachers are required to participate in

mandatory sexual harassment training, but that training is limited to preventing sexual

harassment amongst co-workers. A separate training includes a module on intervening in peer-

to-peer sexual harassment, but that segment lasts no more than fifteen minutes; includes no

substantive information about recognizing, reporting, or responding to harassment; and is

required only once to obtain teacher certification.

364.    DASA/RFA Liaisons at each school receive training on harassment and

discrimination, but trainings are typically limited to newsletters or optional webinars.[108]

365.    The 2016 Attorney General report has characterized NYC DOE staff training on

harassment and discrimination as "sparse and inadequate."[109]

366.    The 2018 New York City Comptroller's report found that the underreporting

likely signifies "a lack of adequate training about the reporting process and the relevance of

documenting the types of problems most common in particular school communities."[110]

367.    The NYC Comptroller's Report found that the NYC DOE does not provide

schools with funding to support training, materials, or resources for the RFA/DASA Liaison.[111]

---

[108] *Id.*

[112] New York Att'y General Letter on DASA, *supra* note 81, at 7.

[113] New York City Comptroller, *supra* note 84, at 11.

[111] *Id.* at 11-12.

368.    As a result of Defendants' failure to train, support, and supervise its employees, Plaintiffs' complaints of sexual harassment and sexual assault were ignored and went unreported in violation of Title IX.

### Failure to Evaluate Students for Special Education Services

369.    The IDEA requires NYC DOE to re-evaluate a student with disabilities if the students' educational or related services and needs warrant a re-evaluation. 20 U.S.C. § 1414(a)(2). Students with disabilities must be assessed in all areas of suspected disability, and any evaluation must be sufficiently comprehensive to identify all of the student's needs. 20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304(c).

370.    Similarly, the ADA and Section 504 require schools to provide re-evaluations "tailored to assess specific areas of educational need" when a change in special education placement or services is needed. 34 C.F.R. § 104.35.

371.    Defendants have engaged in a pattern and practice of failing to re-evaluate students who are exhibiting trauma-related mental, behavioral, and emotional health challenges as a direct result of gender-based violence. In doing so, Defendants have consistently ignored their legally mandated obligation to re-evaluate students with disabilities who may have new disabling conditions.

372.    Defendants have routinely denied students the opportunity to receive appropriate special education services.[112] In 2018, federal officials identified NYC DOE as failing to comply

---

[111] *Id.* at 10-11.

[112] *See* Reema Amin, *The Feds Have Called Out New York for a Decade on its Special Education Record. That's News to Some Policymakers*, Chalkbeat (Mar. 11, 2019), https://www.chalkbeat.org/posts/ny/2019/03/11/203726/.

with the IDEA. This is the thirteenth consecutive year that NYC DOE received this designation.[113]

373.    Defendants fail to re-evaluate with disabilities students who exhibit trauma-related mental, behavioral, and emotional health challenges as a direct result of gender-based violence in violation of the IDEA, the ADA, and Section 504.

374.    Defendants fail to timely convene an IEP meeting in order to conduct a re-evaluation when a student shows symptoms of trauma following an incident of sexual assault or harassment.

375.    When the IEP meeting is convened, Defendants fail to take into account the impact of trauma as it relates to the student's educational performance, and fail to make appropriate adjustments to the student's IEP.[114]

376.    In addition, Defendants fail to train school personnel regarding their obligation to conduct a re-evaluation of a student's IEP to address potential new disabilities when a student has been the victim of gender-based violence.

377.    Defendants also fail to provide notice to parents of their right to revise their child's IEP to address the impacts of trauma.

378.    Neither the NYC DOE's Standard Operating Procedures Manual ("SOPM") nor the Chancellor's Regulations advises parents or school personnel that students who experience emotional or behavioral challenges as a result of gender-based violence or other traumatic

---

[113] *Id*; *see also New York State IDEA School District Determinations for 2018*, New York State Educ. Dep't (Feb. 20, 2019), http://www.p12.nysed.gov/specialed/spp/nysdeterminations/2018-district-determinations.html.

[114] An improper predetermination of a student's IEP may be demonstrated, in part, by the school's failure to discuss bullying, harassment, or assault as it relates to the student's IEP. *T.K. v. New York City Dep't of Educ.*, 779 F.Supp.2d 289, 317 (E.D.N.Y. 2011).

experiences are entitled to the creation or revision of an IEP if those challenges limit the student's ability to engage with his or her education.

379.    As a consequence of Defendants' failures, Plaintiffs were not evaluated for trauma-related disabilities and did not receive IEPs tailored to address the disabilities they experienced as a result of gender-based violence.

## FIRST CAUSE OF ACTION:
## VIOLATIONS OF TITLE IX

380.    Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

381.    Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sexual discrimination.

382.    Plaintiffs were victims of repeated assault harassment because of their gender.

383.    Defendants possessed actual knowledge of the numerous acts of sexual assault and harassment directed towards Plaintiffs while they were on school property.

384.    At all relevant times, Defendants exercised substantial control over the sexual harassers and assailants who, at all relevant times, were students enrolled in NYC DOE schools.

385.    The harassment and assaults suffered by Plaintiff were so severe, pervasive, and objectively offensive that they effectively denied Plaintiffs equal access to educational opportunities or benefits.

386.    Defendants acted with deliberate indifference to the acts of harassment by failing to take any action to prevent them, to deter the students responsible, or to protect Plaintiffs from sexual harassment while they were involved in school programs and activities.

387. Defendants failed to conduct investigations into allegations of gender-based violence and failed to prepare written reports as to whether the complaints were substantiated in each instance.

388. Defendants failed to provide interim or permanent measures to ensure that Plaintiffs could continue to enjoy access to educational opportunities and benefits.

389. These failures arose from Defendants' systemic failure to provide sufficient training to educators and administrators at their schools regarding their obligations under Title IX, including how to identify and address sexual harassment among students and how to respond to a peer report of harassment or assault.

390. Defendants failed to adequately staff the Title IX Coordinator position.

391. Defendants failed to promulgate and/or implement a policy that affirmatively provides notice of its Title IX obligations and responsibilities to educators and administrators at their schools. Defendants have also failed to provide notice to students and parents about how to report a Title IX violation when there is an allegation of gender-based violence.

392. As a result of Defendants acts of omissions, Plaintiffs continued to experience harassment and assault.

393. By virtue of the above, Defendants acted intentionally and with deliberate indifference to the systemic denial of Plaintiffs' access to educational opportunity or benefit. Defendants' violation of their duty to Plaintiffs arises from Defendants' systemic failure to properly implement Title IX.

394. The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety,

emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

## SECOND CAUSE OF ACTION:
## VIOLATION OF TITLE IX: RETALIATION

395.     Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

396.     Plaintiffs Maria Doe and Lisa Doe engaged in protected activity by making complaints to their schools' personnel about the sexual harassment they experienced.

397.     Defendants were aware that Plaintiffs Maria Doe and Lisa Doe engaged in protected activity.

398.     Plaintiffs Maria Doe and Lisa Doe suffered adverse educational action when Defendants suspended them shortly after they made their complaints.

399.     There was a causal connection between Maria Doe and Lisa Doe's sexual harassment complaints and Defendants' choice to impose adverse educational action upon them.

400.     By virtue of the above, Defendants retaliated against Maria Doe and Lisa Doe in violation of Title IX.

401.     The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

### THIRD CAUSE OF ACTION:
### VIOLATIONS OF THE IDEA

402.    Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

403.    The IDEA guarantees the rights of children with disabilities to have a free appropriate public education provided in conformity with a valid IEP.

404.    Gender-based violence often causes trauma-related mental, emotional, and behavioral health challenges that constitute both short-term and long-term emotional disabilities and health impairments under the IDEA. These trauma-related health challenges require the support of special education and related services.

405.    Plaintiffs experienced gender-based violence, which resulted in trauma-related health challenges that have interfered with and limited their ability to participate in or benefit from school programs and which continue to have a detrimental impact on their education.

406.    Because of these trauma-related health challenges and the way they exacerbated Plaintiffs' preexisting disabilities, Plaintiffs are disabled within the meaning of the IDEA.

407.    Defendants failed to re-evaluate Plaintiffs' special education needs based on symptoms of new suspected disabilities and changes in the manifestation of pre-existing disabilities caused by the gender-based violence they experienced. .

408.    Defendants' conduct is part of a pattern and practice of routinely disregarding their federal mandate to re-evaluate students with disabilities who may have new disabling conditions that result from gender-based violence.

409.    By failing to have a policy requiring school personnel to timely convene IEP meetings upon learning that a student has experienced gender-based violence and is showing symptoms of trauma-related disabilities, Defendants have violated Plaintiffs' rights under the

IDEA to be assessed for services in all areas of suspected disability and to receive a revised IEP when lack of progress, anticipated needs, or "other matters" impact the student's educational performance.

410.    By failing to train school-based staff to re-evaluate students experiencing trauma-related health challenges caused by gender-based violence, Defendants have violated Plaintiffs' rights under the IDEA to be assessed in all areas of suspected disability.

411.    By failing to provide special education placement, services, and accommodations to meet the needs of students experiencing trauma-related disabilities caused by gender-based violence and trauma-related exacerbation of pre-existing disabilities, Defendants have violated Plaintiffs' rights under the IDEA to an IEP that is properly developed to ensure meaningful progress toward annual goals and in the general education curriculum.

412.    Defendants' repeated and ongoing failure to re-evaluate children that are exhibiting trauma-related mental, behavioral, and emotional health challenges as a direct result of gender-based violence ignores their obligation to evaluate children experiencing new disabilities, even when those students are already receiving services under an IEP.

413.    Through Defendants' acts and omissions complained of, Defendants have therefore violated Plaintiffs' rights under the IDEA.

414.    Defendants' violation of their duties to Plaintiffs arises from their systemic failure to fully and properly implement the IDEA.

415.    Plaintiffs are not required to exhaust administrative remedies, as attempting to do so would have been futile.

416.    Because the acts and omissions complained of are systemic in nature, they are not capable of redress through an individual due process hearing.

417.     Hearing officers under the IDEA do not have jurisdiction to order Defendants to create or implement the across-the-board policies and practices needed to redress Defendants' legal violations.

418.     The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

## FOURTH CAUSE OF ACTION:
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

419.     Plaintiffs incorporate the above paragraphs as if fully set forth herein.

420.     Plaintiffs are qualified individuals with disabilities under the ADA.

421.     Plaintiffs each experienced gender-based violence.

422.     As a result of gender-based violence, Plaintiffs experienced trauma-related mental, emotional and behavioral health challenges that substantially limit major life activities, including learning, reading, concentrating, thinking, and communicating.

423.     Defendants were and continue to be on notice of Plaintiffs' trauma-related disabilities.

424.     Defendants fail to provide reasonable accommodations for plaintiffs' trauma-related disabilities, including but not limited to, conducting re-evaluations to determine what additional services plaintiffs require and providing training to equip staff to work with students who have experienced trauma and resulting disabilities.

425.     Plaintiffs continue to experience trauma-related mental, emotional, and behavioral health challenges that substantially limit major life activities.

426.     Defendants have discriminated against Plaintiffs on the basis of trauma-related disability and violated Plaintiffs' rights under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132.

427.     The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

### FIFTH CAUSE OF ACTION:
### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

428.     Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

429.     Gender-based violence often causes trauma-related mental, emotional, and behavioral health challenges. These trauma-related disabilities can manifest as short-term or long-term emotional disabilities or health impairments that, independently and in conjunction with the Plaintiffs' pre-existing disabilities, substantially limit the major life activities described above.

430.     The effects of trauma cause an impairment that limits a student's ability to learn, read, concentrate, think, communicate, and make meaningful educational progress without reasonable accommodations.

431.     Plaintiffs have all experienced gender-based violence and trauma-related health challenges associated with that violence.

432.     Plaintiffs are disabled within the meaning of Section 504 of the Rehabilitation Act because they suffer from trauma-related disabilities.

80

433.   As a result of gender-based violence, Plaintiffs experienced trauma-related mental, emotional and behavioral health challenges that substantially limit major life activities, including learning, reading, concentrating, thinking, and communicating, and exacerbation of pre-existing learning disabilities, cognitive delays, mental health impairments, including ADHD, depression, and anxiety.

434.   Plaintiffs continue to experience trauma-related mental, emotional, and behavioral health challenges that substantially limit major life activities.

435.   Defendants were and continue to be on notice of Plaintiffs' trauma-related disabilities.

436.   Defendants failed and continue to fail to provide reasonable accommodations for Plaintiffs' disabilities, including but not limited to, conducting re-evaluations to determine what additional services plaintiffs require and providing training to equip staff to work with students who have experienced trauma and resulting disabilities.

437.   Defendants have discriminated against Plaintiffs on the basis of trauma-related disabilities and violated Plaintiffs' rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

438.   The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

## SIXTH CAUSE OF ACTION:
## VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW

439.    Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

440.    Defendants constitute a "public accommodation" within the meaning of the New York City Human Rights Law ("NYCHRL"), as they provide services to the public.

441.    Defendants have failed to take reasonable steps to provide appropriate notice and training on, investigation of, and response to reported sexual harassment and sexual assault.

442.    Defendants have failed to take appropriate measures to safeguard the health and well-being of Plaintiffs in school.

443.    Defendants, in failing to reasonably accommodate Plaintiffs' disabilities, have discriminated against them on the basis of their disability.

444.    Defendants have discriminated against plaintiffs on the basis of sex and disability status by denying Plaintiffs the full and equal enjoyment, on equal terms and conditions, of the accommodations, advantages, services, facilities or privileges of the NYC school system, including access to special education services. NYC Admin. Code § 8-107 (4) (a)(1)(a).

445.    The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

## JURY DEMAND

446.     Plaintiffs demand a trial by jury on all issues pursuant to the Seventh Amendment to the U.S. Constitution and Rule 38 of the Federal Rules of Civil Procedure.

## REQUEST FOR RELIEF

WHEREOF, Plaintiffs respectfully request that this Court:

1.     Declare Defendants' acts and omissions as complained of to be unlawful and in violation of Title IX, IDEA, the ADA, the Rehabilitation Act, and the New York City Human Rights Law.

2.     Enter a permanent injunction barring Defendants from continuing to engage in the unlawful, discriminatory violations of Title IX and ordering defendants to:

   a.   Order Defendants to implement policies, practices, and training programs requiring all schools to provide clear notice of reporting procedures for sexual harassment and assault;

   b.   Order Defendants to implement policies, practices, and trainings programs for all teachers, staff, and school officials on how to respond to reports of sexual harassment and assault;

   c.   Order Defendants to implement policies, practices, and training programs for all teachers, staff, and school officials on how to provide interim and permanent safety measures for students who have experienced sexual harassment and assault.

   d.   Order Defendants to staff an adequate number of Title IX Coordinators who are employed full time and without conflict of interest.

83

3.      Declare Defendants' current policies, procedures, patterns and practices of failing to re-evaluate students with disabilities who are exhibiting trauma-related mental, behavioral, and emotional health challenges as a direct result of gender-based violence to be a violation of the IDEA, Section 504, and the ADA;

4.      Enter a permanent injunction barring Defendants from carrying out their current policies, procedures, patterns and practices of failing to comply with the IDEA by failing to re-evaluate students for trauma-related disabilities;

5.      Order Defendants to comply with the requirements of the IDEA, the Rehabilitation Act and the ADA, specifically, by implementing policies, practices, and training programs to assess and evaluate students suspected of having trauma-related disabilities, especially in the wake of a traumatic incident of which Defendants have actual knowledge, and to timely conduct IEP meetings following reports of assault, harassment, or other traumatic incidents of which Defendants have actual knowledge;

6.      Award Plaintiffs damages in an amount to be determined at trial;

7.      Award Plaintiffs reasonable attorneys' fees and costs; and

8.      Grant any other and further relief that this Court may deem just and proper.

9.      Retain jurisdiction over this matter until Defendants demonstrate full compliance with the Court's order.

Dated: April 29, 2019
         Queens, New York


Respectfully Submitted,

Amy Leipziger, Esq.
Katrina Feldkamp, Law School Graduate
    practicing under Christopher Lamb, Esq.
Edward Josephson, Esq.
Christopher Lamb, Esq.
Nanettte Schorr, Esq.
Legal Services NYC
40 Worth Street, 6th Floor
New York, NY 10013
(347) 592-2198
aleipziger@lsnyc.org
kfeldkamp@lsnyc.org

_____
Attorney for Plaintiffs


Catherine Schumacher, Esq.
Susan Hu, Esq.
Danielle Craft, Esq. (*pro hac vice* forthcoming)
Kathleen Dallon, Esq. (*pro hac vice* forthcoming)
Kati Schaeffer, Esq. (*pro hac vice* forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000

_____
Attorney for Plaintiffs